Argued and submitted February 25, reversed and remanded August 4, 2004

STATE OF OREGON,
*Respondent,*

*v.*

DOUGLASS P. AMAN,
*Appellant.*

D0004073T, D0004074T; A117601 (Control), A117602
(Cases Consolidated)

95 P3d 244

Ernest G. Lannet, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer,* Judges.

BREWER, J.

---

* Brewer, J., *vice* Leeson, J. pro tempore.

## BREWER, J.

Defendant appeals his conviction for misdemeanor driving under the influence of controlled substances (DUII-CS). ORS 813.010.[1] His appeal presents the question whether the results of an incompletely administered 12-step Drug Recognition Expert (DRE) protocol are admissible as scientific evidence to prove that a defendant was under the influence of a controlled substance.[2] We hold that they are not, and we reverse and remand.

---

[1] Defendant also was convicted of reckless driving. ORS 811.140. He does not challenge that conviction on appeal.

[2] As set forth in *State v. Sampson*, 167 Or App 489, 494-95, 6 P3d 543, *rev den*, 331 Or 361 (2000), the 12 DRE protocol steps described in the National Highway Traffic Safety Administration publication, "Drug Evaluation and Classification Training Student Manual" IV-3 to IV-22 (1993), are as follows:

1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

3. The DRE officer conducts a preliminary physical examination by checking the subject's eyes for synchronization and pupil size, checking the pulse, and asking general health questions. This step determines whether the subject is impaired by a medical condition.

4. The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

5. The DRE officer conducts four field sobriety tests: the Romberg balance test, the walk and turn test, the one-leg-stand test, and the finger-to-nose test.

6. The DRE officer checks the subject's pulse, blood pressure, and body temperature.

7. The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

8. The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

9. The DRE officer inspects for injection sites.

10. The DRE officer conducts a focused interrogation and observation of the subject's behavior.

11. Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

12. The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer.

The purpose of DRE protocol evidence is "to make more probable a fact of consequence—that [the] defendant was under the influence of a controlled substance." *Sampson*, 167 Or App at 499.

The relevant facts are not in dispute. At about 12:00 a.m. on April 11, 2000, a motorist, Mary Starr, observed defendant's car parked under a street light and pointed against the direction of traffic, with the front of the car against the curb and the back in the traffic lane. Starr saw defendant on his knees next to the car, stumbling and trying to get up. She asked if he needed assistance; defendant stood up, tried to push the car uphill away from the curb and told Starr that he was fine. At one point in his effort to push the car, defendant fell to his knees. Starr concluded that defendant was drunk and needed assistance and drove home to pick up her husband.

When she returned, Starr saw defendant's car driving toward her on the wrong side of the street. The car's headlights were not on, and it was weaving. Starr stopped her car and waited to see what defendant would do. Defendant pulled into the correct lane of traffic and, as he drove alongside Starr's vehicle, she told him to turn on his lights. Defendant responded, "My lights aren't on?" and asked if she was the same person who had offered him assistance earlier. She replied affirmatively, and defendant turned on his lights and continued down the street.

Starr and her husband followed defendant. Defendant's car was weaving "a little bit," and he repeatedly accelerated to about 20 miles per hour and then slowed to a near stop. He drove through an intersection controlled by a stop sign without stopping and started to enter a signal-controlled intersection before the light turned green. Starr read defendant's license plate number and called 9-1-1 on a cell phone. Deputy Pastori responded to the call. Using the license plate number, he found defendant's vehicle parked in the driveway of the registered owner. Pastori contacted defendant's mother, who told him that defendant was in the garage, and she gave Pastori permission to enter the home.

Pastori spoke with defendant. After an initial denial, defendant admitted that he had been driving. During the encounter, Pastori suspected that defendant was under the influence of a controlled substance. Pastori called for backup and requested a drug recognition expert, because he was not certified in administration of the DRE protocol.

Defendant agreed to perform field sobriety tests. After additional officers arrived, Pastori administered the tests, including the horizontal gaze nystagmus (HGN) and vertical gaze nystagmus (VGN) tests. Pastori observed no nystagmus. From those results, Pastori believed that defendant had no alcohol in his system. Defendant's performance on the one-leg-stand test, a backward count test, and an alphabet test was poor; he swayed and was unable to balance and count at the same time. Pastori concluded that defendant was impaired and under the influence of a controlled substance, but not alcohol. He arrested defendant and, in the course of a patdown search, found a syringe in defendant's pocket with dried blood on it. Pastori then took defendant to the precinct office.

Sergeant Mori was one of the officers who had responded to Pastori's call for assistance. Mori, who was DRE certified, observed Pastori administer the field sobriety tests to defendant. At the precinct office, Mori performed the first 11 of the 12 DRE protocol steps. He first administered an Intoxilyzer test, which revealed defendant's blood alcohol level as 0.00 percent. Mori then performed the second step of the protocol by interviewing the arresting officer, Pastori. Pastori recounted his observations of defendant's behavior during the field sobriety tests, some of which Mori himself had observed.

With respect to the third step of the protocol, Mori found defendant's speech slurred and loud, his voice raspy and deep, his coordination poor, his face sweaty, his pulse elevated, and his breath rancid. From those observations, Mori suspected that defendant was under the influence of a drug.

The fourth protocol step is the eye examination and, because defendant did not display nystagmus, Mori ruled out three drug categories—central nervous system depressants, PCP, and inhalants—as possible sources of defendant's impairment. Step five of the DRE protocol—the Romberg balance test, walk and turn test, one-leg-stand test and the finger-to-nose test—was difficult for defendant to perform. During the administration of those tests, defendant ground his teeth, flexed his arms, and swayed. He also had difficulty

estimating the passage of time. Mori testified that it is unusual for a person whose "internal clock" is slow to behave as tensely as defendant did. Based on his training, Mori believed that defendant's symptoms were consistent with the consumption of drugs having conflicting effects.

Step six requires checking vital signs, including blood pressure, temperature, and another pulse reading. In defendant's case, all of those readings were normal except for pulse, which was somewhat elevated. Step seven, the measurement of pupil size, revealed that defendant's pupils were within the normal range but were slow to react to light. Mori opined that that result also was consistent with the ingestion of drugs having conflicting effects.

Step eight requires review of a defendant's muscle tone. Mori described defendant's tone as "rigid." At step nine, Mori looked for injection marks and again took defendant's pulse. He found red injection marks on both arms.

Step 10 is a focused interrogation and observation. In that regard, defendant said he had ingested "chivas" "yesterday." "Chivas" is a street name for heroin. Step 11 is the formal opinion of the drug recognition expert. Mori concluded that defendant was impaired, not able to operate a vehicle safely, and was under the influence of a central nervous system stimulant and a narcotic analgesic.

As noted above, the final step of the DRE protocol requires obtaining a urine sample and submitting the sample for toxicological analysis. That portion of the protocol is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer. *State v. Sampson*, 167 Or App 489, 495, 6 P3d 543, *rev den*, 331 Or 361 (2000). Defendant was unable to produce a urine sample, even after two hours of waiting. There is no evidence in the record as to why the process did not continue until defendant produced a urine sample. However, Mori testified that defendant's inability to provide a urine sample was consistent with his having ingested a narcotic analgesic.

At trial, defendant offered explanations for his behavior. He testified that he was going through heroin withdrawal. He admitted taking Xanax, a central nervous system

depressant, and he stated that he suffered from Ménière's disease, a condition affecting balance. The Xanax was prescribed for defendant's Ménière's disease to moderate the vertigo associated with the condition. Mori was aware of defendant's explanation, but it did not change his conclusion regarding the source of defendant's impairment.

A jury found defendant guilty of DUII-CS, and he appeals the ensuing judgment of conviction. In his sole assignment of error, defendant asserts that the trial court erred in admitting the DRE evidence. Defendant asserts that our decision in *Sampson* set out the proper standards for the admission of DRE protocol evidence and that, because the officer failed to administer the twelfth step—the toxicological analysis of defendant's urine—evidence of the partial administration of the DRE protocol and its result was inadmissible as scientific evidence.

In *Sampson*, we held that, when administered by a properly qualified person, the complete 12-step DRE protocol is valid scientific evidence, the procedures and results of which are sufficiently reliable to be admissible in a DUII-CS prosecution to show that a defendant was under the influence of a controlled substance. We cautioned, however, that without the corroborating evidence of the urinalysis called for in the twelfth step, "the DRE protocol cannot be considered complete." *Id.* at 510. In this case, defendant was either unable or unwilling to supply the urine sample required to complete the twelfth step of the protocol. Notwithstanding that failure, the trial court admitted the DRE protocol evidence over defendant's objection. Thus, we are called on to decide whether the incomplete DRE protocol satisfies the seventor test for admission of scientific evidence approved in *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). We summarized that test in *Sampson*. The factors are:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5)   The existence of specialized literature;

"(6)   The novelty of the invention; and

"(7)   The extent to which the technique relies on the subjective interpretation of the expert."

*Sampson*, 167 Or App at 500 (quoting *O'Key*, 321 Or at 299) (footnotes omitted; internal quotation marks omitted).

Applying those factors to the record here, defendant argues that there is no evidence of general acceptance by the scientific community of an 11-step DRE protocol; there is no showing that such a protocol has been put to use in isolation; the state did not identify any operational safeguards for an 11-step DRE protocol; the state presented no evidence about the error rate of an 11-step protocol; there is no evidence of an 11-step protocol in specialized literature nor any evidence that it has been submitted to peer review; and, finally, an step protocol is inherently subjective because it lacks laboratory corroboration. Defendant relies on our decision in *Sampson* for support. There, we said:

"Although the protocol has some subjective aspects in common with HGN—such as the induplicability and unverifiability of test conditions that were noted in *O'Key*—in the DRE protocol, the urinalysis is indispensable if the officer believes that the subject is under the influence of a controlled substance. If the urine screen does not corroborate the DRE's opinion, the officer's test is considered a failure. If the DRE officer does not obtain a urine sample, the DRE protocol cannot be considered complete. Those factors vitiate the problem of the DRE protocol's subjectivity, such as it is, and we conclude that the protocol satisfies this portion of the [standards for reliability and admissibility of scientific evidence set out in *Brown* and in *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993)]."

*Sampson*, 167 Or App at 510.

Defendant contends that evidence of an uncorroborated DRE test "invites the jury to decide the facts of the case on an improper basis—that of deferring to the safe haven of conclusions drawn by a scientific method that withstood scientific scrutiny when, in fact, the technique has not been shown to be scientifically valid." Defendant notes that Mori

testified at length about his training and experience and the details of the 12-step protocol. According to defendant, although the incomplete administration of the DRE protocol rendered the results not scientifically valid, the jury was left with the impression that the evidence *was* scientific.

The state responds that toxicology results do not correlate directly to a suspect's impairment but furnish only circumstantial evidence to corroborate a DRE examining officer's opinion. The state relies on *State v. Jayne*, 173 Or App 533, 540, 24 P3d 920 (2001), in which we held that, although urinalysis evidence did not show that the defendant was impaired because of drug use, such evidence had at least some tendency to show that the defendant had used drugs at some time before an accident. The state asserts that, analogously to *Jayne*, the twelfth step of the DRE protocol serves only to support the examining officer's scientifically based conclusions, not to provide independent scientific evidence of drug use. The state argues:

> "Based on the circumstantial evidence, including defendant's own admissions, the [urinalysis] was not necessary to the admissibility of the DRE in this case. The only function that the [urinalysis] would have served, *i.e.*, corroborating Sergeant Mori's conclusions, was more than adequately accomplished by other evidence. For that reason as well, the trial court correctly admitted the DRE evidence."

According to the state, failure to obtain a urine sample for testing will sometimes occur in the administration of the DRE protocol, "based on the nature of the controlled substance a defendant has consumed. That fact does not somehow invalidate the foundation for the protocol." Thus, the state asserts, "it is *only* the first 11 steps that determine whether a driver is impaired. The toxicology results do not speak to that issue and thus, their absence does not argue against admissibility under this prong of the *Brown / O'Key* test." (Emphasis in original.) The state also notes that Mori's personal accuracy rate in administering the test is "well over 90 percent." That evidence, the state reasons, is an effective substitute for the corroboration provided by the twelfth step of the DRE protocol. In the state's view, the basic test for admission of scientific evidence requires consideration of all

*O'Key* factors, and one factor alone rarely will dictate exclusion.

The state misunderstands the basis for our decision in *Sampson*. The issue is not whether the administration of an 11-step test in this case showed that defendant was impaired. The question, rather, is whether the test *as given* meets the standards for valid scientific evidence that perly could be presented as such to the jury. Again, in *Sampson*, we approved the 12-step DRE protocol as scientific evidence because its complete administration by a competent examiner qualified for admission as scientific evidence under *O'Key*. As the Supreme Court explained in that case,

> "[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. *See* John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or L Rev 349, 361 (1992) (explaining this concept). Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation. *Id.* at 368. This approach 'ensure[s] that expert testimony does not enjoy the persuasive appeal of science without subjecting its propositions to the verification processes of science.' *Id.*"

*O'Key*, 321 Or at 291-92 (footnote omitted). Stated another way, nonscientific evidence presented as if it were scientific may be highly persuasive to a lay jury, and the trial court, therefore, is obligated to ensure that what is presented to the jury as valid scientific evidence does, in fact, meet that standard.

■    Here, there is no evidence that the methodology employed—an 11-step DRE test without toxicological confirmation—generally has been accepted in the relevant field, has been used in a reported judicial decision, has a known rate of error, is mentioned in specialized literature, or is not a novel, even singular, employment in this state. To the contrary, the omission of the corroborating toxicology report

deprives the test of a major element of its scientific basis, and there is no evidence that an examiner's reputation for accuracy constitutes an adequate substitute. As we explained in *Sampson*:

> "[I]t is questionable whether the DRE protocol as a whole can even be considered 'subjective' under *Brown*, because the DRE officer *must corroborate his or her opinion with urinalysis. See O'Key*, 321 Or at 318, (HGN test is 'subjective' in part because '[t]he officer who administers the test has no physical sample to take to a laboratory'). Although the protocol has some subjective aspects in common with HGN—such as the induplicability and unverifiability of test conditions that were noted in *O'Key*—*in the DRE protocol, the urinalysis is indispensable if the officer believes that the subject is under the influence of a controlled substance. If the urine screen does not corroborate the DRE's opinion, the officer's test is considered a failure. If the DRE officer does not obtain a urine sample, the DRE protocol cannot be considered complete.* Those factors vitiate the problem of the DRE protocol's subjectivity, such as it is, and we conclude that the protocol satisfies this portion of the *Brown / Daubert* test."

*Sampson*, 167 Or App at 510 (emphasis added).

That is not to say that evidence of individual tests or observations that are components of the DRE protocol necessarily are inadmissible as nonscientific evidence of drug impairment or some other condition. However, for the reasons explained above, we conclude that an incompletely administered DRE protocol is not, itself, admissible as scientific evidence. Accordingly, the trial court erred in admitting evidence of the DRE procedures and results as scientific evidence.

■■ The state next urges that any error in admitting the DRE protocol results was harmless. In *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003), the Supreme Court clarified the standard that is applicable in determining whether the erroneous admission or exclusion of evidence affected a criminal defendant's substantial rights:

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of

the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

Defendant concedes that, apart from the DRE protocol evidence, there was evidence to support the inference that he drove under the influence of a narcotic analgesic. That evidence included the testimony of Starr, Pastori, and Mori concerning defendant's impaired behavior. However, as discussed, defendant also offered an explanation, apart from illegal drug use, for his behavior. For its part, the state relied heavily on the DRE protocol evidence. The potential for scientifically based evidence to exert influence on a jury is manifest. *See Brown*, 297 Or at 440 ("[S]cientific evidence must not 'assume a posture of mystic infallibility in the eyes of a jury of lay[persons].' ") (quoting *United States v. Addison*, 498 F2d 741, 744 (DC Cir 1974) (brackets in orignal)). We cannot say that there is little likelihood that the error in admitting the incomplete DRE protocol results affected the verdict.

Reversed and remanded.