Argued and submitted July 20, 2007, reversed and remanded August 13, 2008

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TERRI LYNN McFARLAND,
*Defendant-Appellant.*

Jackson County Circuit Court
032017MI; A126562

191 P3d 754

Michael A. Breiling argued the cause and filed the brief for appellant.

Joanna Jenkins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant appeals her conviction for driving under the influence of intoxicants. ORS 813.010(4). Defendant argues that the trial court erred in permitting a drug recognition expert (DRE) trainee who was not certified as a DRE officer to testify about the administration and results of a DRE protocol that he administered. We review for errors of law, *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 299, 14 P3d 596 (2000), and we hold that a DRE trainee is not qualified to provide expert testimony regarding his assessment of the DRE protocol. Accordingly, we reverse and remand.

The relevant facts are not in dispute. Around noon on the day in question, defendant was driving her car when she struck a parked car. Medford Police Officer Jackson was the first officer on the scene. Upon Jackson's arrival, he watched defendant get out of her car. Jackson testified that "she seemed disoriented, kind of dazed and confused and was having trouble walking steadily." Shortly thereafter, Officer Kirkpatrick approached defendant. Kirkpatrick observed that

> "[defendant's] pupils were slightly constricted. She had a slow and slurred speech. She was having extreme trouble maintaining her balance and was leaning on the car to keep her balance. Her speech was, like I said, slow and confused. I did not note an odor of alcoholic beverage.
>
> "And at that time, I felt that she was under the influence of some sort of—some sort of substance just based on the impairment I was seeing."

Defendant explained to Kirkpatrick that she was ill, had back trouble, and had taken medication. Based on his observations, Kirkpatrick suspected defendant was under the influence of intoxicants and began a DUII investigation. Defendant consented to take a horizontal gaze nystagmus (HGN) test—one type of field sobriety test.[1] Based on defendant's appearance and behavior, as well as her performance

---

[1] It is helpful to have a general understanding of the laws and rules governing the tests for driver impairment. ORS 801.272 provides:

" 'Field sobriety test' means a physical or mental test, approved by the Department of State Police by rule after consultation with the Department of Public

on the field sobriety test, Kirkpatrick placed defendant under arrest for DUII. At the police station, defendant's Intoxilizer test resulted in a reading of .00 percent blood alcohol content, indicating that she had not consumed alcohol. Kirkpatrick requested a DRE evaluation to gain more information about defendant's apparent impairment. Officer Furst, a certified DRE officer and Kirkpatrick's training officer, was the supervisor on duty. Furst asked Officer Lane to conduct a DRE evaluation on defendant. At that time, Lane had completed the DRE training, however, he had not taken the final written exam and was thus only a DRE trainee and not a certified DRE officer.

In performing the DRE evaluation, Lane testified that he followed the 12 steps on the DRE protocol form.[2] Lane

Safety Standards and Training, that enables a police officer or trier of fact to screen for or detect probable impairment from intoxicating liquor, a controlled substance, an inhalant or any combination of intoxicating liquor, an inhalant and a controlled substance."

OAR 257-025-0005 instructs that:

"ORS 801.272 generally provides that the Oregon State Police approve by rule, after consultation with the Board on Public Safety Standards and Training (BPSST), physical and/or mental tests that enable a police officer or trier of fact to screen for or detect evidence of physical condition that indicates probable impairment from intoxicating liquor, a controlled substance or a combination of intoxicating liquor and controlled substance. Tests meeting the requirements of ORS 801.272 are defined as field sobriety tests and are listed and described in OAR 257-025-0012 and OAR 257-025-0020."

OAR 257-025-0012 includes a list of approved tests for all sworn police officers and additional tests to be performed only by officers who have met certain criteria. Section three of that rule provides a list of additional tests utilized by an officer "trained and approved by the Oregon State Police as a Drug Recognition Expert (DRE)" and "upon successful completion of the 72-hours of DRE training * * *."

[2] As set forth in State v. Sampson, 167 Or App 489, 494-95, 6 P3d 543, rev den, 331 Or 361 (2000), the 12 DRE protocol steps described in the National Highway Traffic Safety Administration publication, "Drug Evaluation and Classification Training Student Manual" IV-3 to IV-22 (1993), are as follows:

1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

3. The DRE officer conducts a preliminary physical examination by checking the subject's eyes for synchronization and pupil size, checking the pulse, and asking general health questions. This step determines whether the subject is impaired by a medical condition.

4. The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

interviewed Kirkpatrick, the arresting officer, and confirmed that defendant's Intoxilizer test indicated that she had not consumed alcohol. Lane asked defendant if she had any medical conditions and defendant responded that she had taken two Vicodin pills and two "Soma" pills.[3] Next, Lane administered the physical tests required by the DRE protocol, and he also checked defendant's clinical indicators at the required intervals.

At the conclusion of the DRE protocol, Lane determined that defendant was impaired and that she was under the combined influence of the prescription medications that she had admitted taking. At that point, pursuant to the DRE protocol, defendant provided a urine sample that Lane submitted to the Oregon State Police crime lab for testing. Defendant's urine analysis came back positive for Hydrocodone (*i.e.*, Vicodin), Methadone—a narcotic analgesic, and Carisoprodol (*i.e.*., Soma); all of which are controlled substances.[4] Additionally, at the conclusion of defendant's DRE protocol, Lane telephoned his DRE instructor, Sergeant Selby. Lane described to Selby the procedures that he followed. Lane testified that Selby agreed with his assessment

---

5.    The DRE officer conducts four field sobriety tests: the Romberg balance test, the walk and turn test, the one leg stand test, and the finger-to-nose test.

6.    The DRE officer checks the subject's pulse, blood pressure, and body temperature.

7.    The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

8.    The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

9.    The DRE officer inspects for injection sites.

10.   The DRE officer conducts a focused interrogation and observation of the subject's behavior.

11.   Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

12.   The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer.

    [3] Vicodin is a narcotic analgesic, and Soma is a central nervous system depressant.

    [4] The lab report established that the three controlled substances were present in defendant's urine. However, the lab report is silent regarding the effect, if any, that those substances had on defendant's ability to drive.

that defendant was under the combined influence of the prescription medications that she had admitted taking. Lane also testified that Selby did not personally observe Lane administer defendant's DRE protocol and that Selby's agreement with Lane's assessment was based on information that Lane provided to Selby during their telephone conversation.

Prior to trial, defendant moved to exclude the DRE protocol results on the ground that, at the time Lane administered defendant's DRE protocol, he was not a certified DRE officer and was thus not qualified to testify regarding his assessment. The trial court denied defendant's motion, and the case proceeded to trial.

At trial, defendant renewed her objection to Lane's testimony. The trial court responded to defendant's objection and questioned Lane about his training outside the presence of the jury. Lane informed the court that at the time he conducted defendant's DRE evaluation: (1) he was a trainee in DRE protocol; (2) he had completed the classroom portion of the training; (3) he had conducted more than the minimum number of supervised evaluations required for certification; however, (4) he had neither taken and passed the final written test nor completed the necessary paperwork for certification; and (5) he had conferred with Selby, his DRE training officer, at the end of defendant's DRE protocol. The trial court overruled defendant's objection and permitted Lane to testify as an expert about his assessment of defendant's DRE protocol results.

After the trial reconvened, Furst provided a detailed explanation of DRE protocol in general. Furst also testified that he observed Lane administer defendant's DRE evaluation in its entirety. However, Furst did not testify whether he agreed with Lane's assessment of defendant's DRE protocol.

The only other testimony regarding defendant's DRE evaluation was offered by Lane, who opined that, based on his observations and defendant's performance on the DRE protocol, defendant "was unsafe to operate a motor vehicle." Selby, Lane's DRE training officer, did not testify.

Defendant testified regarding her behavior and performance on the field sobriety test and portions of the DRE

protocol. She testified that prior to the accident she had taken prescription medication for back pain. Additionally, she explained that she typically relies on a walker to help her ambulate and that, because she did not have her walker with her on the day of the accident, she was less steady in her movements. Finally, she testified that the reason she struck the parked car was that she had been adjusting her car radio. The jury found defendant guilty of driving under the influence of intoxicants.

On appeal, defendant assigns error to the trial court's admission of the scientific DRE evidence offered by Lane. Defendant argues that, pursuant to *State v. Sampson*, 167 Or App 489, 6 P3d 543, *rev den*, 331 Or 361 (2000), (1) DRE protocol results are scientific evidence *only when all of the protocol's requirements are satisfied*; (2) that one of the protocol's requirements is that the administering officer is *certified as a DRE officer*; (3) that because Lane had not taken and passed the required written examination he was not a certified "DRE officer;" and (4) as a result, the trial court erred in admitting Lane's testimony as an expert about defendant's DRE evaluation results. We agree with defendant.

To begin, it is helpful to discuss the admission of scientific evidence generally and DRE evidence in particular. To aid our discussion, we cite extensively from *Sampson*, a case in which this court first considered whether DRE protocol evidence is admissible in a DUII trial and under what circumstances. 167 Or App at 493. In *Sampson*, we stated:

> "*To qualify as a DRE officer*, an officer must have experience in traffic enforcement. The first part of DRE training is a 16-hour preschool that teaches the officer to recognize the effects of drugs on the eyes, take vital signs, and administer FSTs. That is followed by a 56-hour training course, covering the 12 steps of the protocol, the eye exams used in steps 3 and 7, taking vital signs, recognizing the symptoms of various drugs, performing parts of the protocol on volunteer drinkers, interpreting the DRE form, instruction on recognizing multiple drug use, and role-playing. Candidates are tested on all material. *To obtain certification, the officer must conduct 12 DRE evaluations (involving at least three drug categories) and obtain nine toxicology screens;*

*there must be a 75 percent corroboration rate between the toxicology result and the DRE candidate's opinion.* The DRE candidate's opinion is considered correct if it identifies one drug in the subject's system correctly and not more than one drug incorrectly. *The candidate must also pass an exam that tests the ability to recognize multiple drug use. The IACP* [International Association of Chiefs of Police] *must give final approval for certification,* which is valid for two years and requires ongoing training."

*Id.* at 495 (emphases added).

Also, in *Sampson,* we considered whether DRE testimony was scientific evidence in light of the Supreme Court's decisions, *State v. O'Key,* 321 Or 285, 899 P2d 663 (1995), and *State v. Brown,* 297 Or 404, 687 P2d 751 (1984). *Sampson,* 167 Or App at 495-511. We answered that question affirmatively and observed that:

"In determining whether evidence is scientific, we also consider whether its scientific assertions have the potential to exert a significantly greater influence on the factfinder than nonscientific evidence. * * * *DRE testimony, with its highly specialized certification procedure,* battery of medicalized tests, and complicated end-stage analysis, does carry that potential * * *. Although the protocol is a mosaic of scientific and observational techniques, their blending means that a juror's perception of the validity of each component will likely be enhanced by the scientific imprimatur of the whole. We conclude that, to the extent a DRE protocol is convincing on the issue of whether a defendant was under the influence of a controlled substance, that persuasive force emanates predominantly from the substance *and* the aura of the scientific principles on which its methodology is based. Consequently, we hold that DRE testimony is scientific evidence."

*Id.* at 496-97 (citations omitted; first emphasis added).

In *Sampson* we also considered DRE evidence in light of the seven factors discussed in *Brown* and *O'Key* regarding the admission of scientific evidence.[5] Two factors

---

[5] As set forth in *Sampson,* 167 Or App at 500, the *Brown/O'Key* factors for scientific evidence are:

"(1) The technique's general acceptance in the field;

"(2) The expert's qualifications and stature;

in particular have a heightened significance to the matter at hand: first, "[t]he expert's qualifications and stature;" and second, "[t]he existence of operational standards controlling the technique and the potential rate of error[.]"

As to the expert's qualifications and stature, we stated that "[t]he reliability of the [DRE] protocol's results depends on the ability of the officer who administers it." We then concluded that the DRE certification suffices to qualify a DRE officer to testify about the administration and results of the protocol. *Sampson*, 167 Or App at 503.

As to the existence of operational standards, we stated:

"DRE programs are certified and regulated by the IACP [International Association of Chiefs of Police]. The NHTSA [National Highway Traffic Safety Administration] sets standards for the HGN test that the *O'Key* court held were sufficient for admissibility * * *. DRE officers must submit a record of all their evaluations to the IACP every two years. If the DRE officer consistently performs poorly, he or she can be decertified * * *. Based on this oversight of the officer's actual performance and *O'Key*'s ratification of the NHTSA standards for the HGN portion of the test, we conclude that the DRE standards are sufficiently strict to ensure the protocol's reliability."

*Id.* at 505.

Our decision in *State v. Aman*, 194 Or App 463, 95 P3d 244 (2004), *rev dismissed as improvidently allowed*, 339 Or 281 (2005) also informs our discussion. In *Aman*, the question before this court was "whether the results of an incompletely administered 12-step Drug Recognition Expert (DRE) protocol are admissible as scientific evidence to prove that a defendant was under the influence of a controlled substance."

"(3) The use which has been made of the technique;

"(4) The potential rate of error;

"(5) The existence of specialized literature;

"(6) The novelty of the invention; and

"(7) The extent to which the technique relies on the subjective interpretation of the expert."

(Citations and footnotes omitted.)

194 Or App at 465. Under the circumstances of that case, the final step in the protocol, the urinalysis, had not been completed. *Id.* at 468-69. The state argued that, because the officer administering the DRE protocol had a very high accuracy rate, the corroboration provided by the urinalysis was effectively substituted. We rejected that argument and stated in *Sampson* that we approved the DRE 12-step protocol because "its complete administration by a competent examiner" met the qualifications in *O'Key* to be admitted as scientific evidence. *Id.* at 472. We concluded that "an incompletely administered DRE protocol is not, itself, admissible as scientific evidence" without an evidentiary showing that the methodology employed in an 11-step DRE protocol met the *O'Key* requirements. *Id.* at 473.

With that general understanding of scientific evidence, and DRE evidence in particular, we turn to the parties' contentions in this case. Defendant argues that, under *Sampson*, "the DRE protocol is scientific evidence; therefore, the person offering it must meet the requirements of OEC 702 to be admitted."[6] In the case of DRE evidence, defendant argues, all steps of the protocol must be performed by a qualified person to be admitted as scientific evidence without having to prove its admissibility under the *Brown/O'Key* test. Defendant reasons that because Lane was not qualified— that is, not certified—the state was required to lay a foundation for the admissibility of the DRE evidence if the state wanted to admit the DRE protocol as scientific evidence.

The state responds that "the trial court was correct in concluding that, although Officer Lane technically did not have his certification at the time he performed the DRE [protocol], he was nonetheless qualified to testify under OEC 702." The state posits that the "actual issue presented by this case is whether the trial court correctly ruled that the expert,

---

[6] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

*i.e.*, the DRE officer, was qualified to testify and give his opinion on the DRE."

■ The state's argument is unavailing because its theory of the case rests on an improper amalgam of the facts and the applicable law. The state asserts that Lane was qualified to testify based on his experience and training, notwithstanding his lack of certification. The state characterizes Lane's incomplete credentials, specifically his lack of certification and the pending status of his final examination, as merely a technical matter. We disagree. Certification as a DRE officer is essential to qualify an officer to testify, as an expert, about scientific DRE evidence: *"The reliability of the [DRE] protocol's results depends on the ability of the officer who administers it. * * * We conclude that DRE certification suffices to qualify a DRE officer to testify about the administration and results of the protocol." Sampson*, 167 Or App at 503-04 (emphases added).

■■ In this case, Lane was not a certified DRE officer. Thus, Lane was not qualified to testify, as an expert, regarding the administration of defendant's DRE protocol or his interpretation of the results. Pursuant to the 12 DRE protocol steps, certification as a DRE officer is a prerequisite to qualify a police officer to give expert testimony about the scientific evidence of DRE protocol. *Sampson*, 167 Or App at 493-95. Without certification, an officer is not qualified to testify as an expert, and without a qualified expert to testify regarding the proper administration and assessment of a defendant's DRE protocol, DRE evidence cannot be admitted as scientific evidence.

■ In this case, the only police officers who testified about DREs were Furst, a certified DRE officer, who described DRE protocols in general but did not validate Lane's administration of defendant's DRE protocol or Lane's assessment,[7] and Lane, who was not qualified to testify because he was not a certified DRE officer when he administered defendant's protocol.

---

[7] We express no opinion in this case as to whether testimony by Furst, confirming Lane's administration and assessment of defendant's DRE protocol, would have been sufficient foundation to allow the admission of Lane's testimony.

As we explained in *Aman*, "[W]e approved the 12-step DRE protocol as scientific evidence because its complete administration *by a competent examiner* qualified for admission as scientific evidence under *O'Key*." 194 Or App at 472 (emphasis added). Again, here, there is uncontroverted evidence that Lane was not certified as a DRE officer at the time he administered defendant's DRE protocol. Accordingly, Lane was not qualified to testify about the administration and assessment of defendant's DRE protocol. Thus, on this record the trial court erred in allowing Lane to testify about his administration and assessment of defendant's DRE protocol.

Our analysis does not end there, however. If we conclude that the trial court erred in admitting the evidence, as we do here, we will not reverse the conviction if "there is little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

■    Here, the state presented other evidence of defendant's behavior and condition indicating defendant's impairment when she struck the parked car. That evidence could support the inference that she drove under the influence of controlled substances. However, defendant testified at the trial and explained that her poor performance on the DRE protocol's physical tests were due, in part, to her back problems and difficulty ambulating without her walker.

■    After reviewing the record, we understand that much of the state's case focused on the evidence of DREs generally, as explained by Furst, and the specific evidence of defendant's DRE protocol assessment, as provided by Lane. As we explained in *Aman*, "[t]he potential for scientifically based evidence to exert influence on a jury is manifest." 194 Or App at 474. When the source of erroneously admitted testimony is a witness presented to the jury as an expert on matters that are scientifically based, it weighs heavily against a determination that an error is harmless. *See State v. Norby*, 218 Or App 609, 180 P3d 782 (2008). Given defendant's contrary testimony, the emphasis of Furst's testimony on the detailed and careful administration of DREs in general, and Lane's testimony detailing specifically each step of the protocol and his conclusions based on that protocol, we cannot

say that there is little likelihood that the error in admitting the DRE protocol evidence affected the verdict.

Reversed and remanded.