Submitted September 24, 2013, affirmed October 15, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*

DWAYNE WILSON,
*Defendant-Appellant.*

Josephine County Circuit Court
091994M; A149315

337 P3d 948

Peter Gartlan, Chief Defender, and Andrew D. Robinson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Joanna L. Jenkins, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Following a jury trial, defendant was convicted of driving under the influence of intoxicants (DUII), ORS 813.010; fourth-degree assault, ORS 163.160; second-degree criminal mischief, ORS 164.354; reckless driving, ORS 811.140; and reckless endangerment, ORS 163.195. He appeals the resultant judgment of conviction, asserting that the trial court erred in admitting testimony from an officer trained as a drug-recognition expert (DRE) in the absence of an adequate scientific foundation for that evidence. Because we conclude that the trial court did not err in admitting the officer's testimony as nonscientific expert opinion evidence, we affirm.

The relevant background facts are undisputed. Early in the evening of November 27, 2009, defendant, who was driving a car in which his girlfriend (Williams) and son were passengers, ran through a red light at an intersection in Grants Pass and collided with another vehicle carrying two people. The other vehicle was totaled as a result of the collision, and the driver of that vehicle was injured.

Burge, a Grants Pass police officer, arrived at the scene of the accident and approached defendant's vehicle. At that time, defendant, his son, and Williams were all standing outside of the vehicle. Burge observed that defendant's pupils were dilated and that he had "spider web, puffy, red, bloodshot eyes" that he associated with the use of marijuana. In addition, as Burge talked with defendant, he noticed "[t]he strong odor of alcohol" on defendant's breath. Burge asked defendant and Williams whether they had been drinking and Williams readily admitted that she had and that she had also smoked marijuana the day before. Defendant, however, did not directly respond and also refused Burge's request that he perform field sobriety tests.

Burge, who had concluded that defendant was under the influence of alcohol and marijuana, arrested defendant and placed him in the back of the patrol car. Defendant ultimately admitted to Burge that he had had "a couple [of] beers during the day and that he had smoked marijuana earlier in the day." A blood sample collected from defendant after the accident was tested by the Oregon State Police Crime Lab

and the results showed a blood alcohol content (BAC) of .085 percent. That sample was retested by another lab more than six months later and, at that time, showed a BAC of .074 percent. As a result of the accident, defendant was charged with DUII, fourth-degree assault, second-degree criminal mischief, reckless driving, and reckless endangerment.

Before trial, defendant moved to prohibit Burge from

"testifying, as an expert, regarding his opinion whether defendant was under the influence of a controlled substance, or any statements regarding the administration or interpretation of any *** DRE evidence conducted in this case, because *** Burge did not complete the DRE protocols required for the admission of such evidence."

Defendant asserted that Burge could not testify about impairment due to controlled substances because, if Burge were allowed to do so, "he would be testifying based upon an incomplete DRE protocol."

The state responded that this was "not a DRE case." According to the state, there were "no [DRE] steps done" by the officer and it did not intend to offer DRE evidence, as such. Instead, the state took the position that the officer could describe his training and experience and offer nonscientific expert opinion testimony based on that training and experience. According to the state, the officer's conclusion, based on his observations, that defendant was impaired by drugs was "not a DRE conclusion"; rather, it was a "conclusion that *** any officer [could] make, whether or not he was a DRE *** that *** somebody who is under the influence of a controlled substance manifests these symptoms."

The court took the matter under advisement and, ultimately, issued a letter opinion setting forth its ruling:

"In this case, the state concedes that Officer Burge cannot give a DRE opinion as to the defendant's intoxication because the protocol is incomplete; and the defense grudgingly concedes that Officer Burge does not need to remain mute during the trial concerning what he saw and observed.

"This court believes that Officer Burge, like any witness, can testify about his training and experience, including all the training associated with his drug recognition

designation. However, the Court does not believe that he should be allowed to identify himself as a certified DRE; because he will not be rendering a DRE opinion in this case and therefore that designation is irrelevant, and could tend to overly impress the jury with the remainder of Officer Burge's testimony."

Although it determined that Burge would not be allowed to identify himself as a DRE, based on *State v. Aman*, 194 Or App 463, 95 P3d 244 (2004), *rev dismissed*, 339 Or 281 (2005), and *State v. Hernandez*, 227 Or App 319, 206 P3d 197 (2009), the court concluded that individual tests or observations that might also be components of the DRE protocol could be admissible as nonscientific evidence of drug impairment and that the officer could offer nonscientific expert evidence. *See* OEC 702.[1]

Accordingly, at trial, Burge described his extensive training and experience in conducting DUII investigations and identifying impaired drivers. In particular, he discussed his lengthy period of service in law enforcement, which began in "the late '80's," and the hundreds of hours of training he had received in conducting DUII investigations and identifying drug-impaired drivers. The state then asked the officer to explain what he was trained to look for when conducting those investigations. He responded:

"Well, there's several things I'm looking for. You're looking for the odor, you're looking for body tremors, leg tremors, eyelid tremors. You're looking at their pupils. Some prescribed medications will constrict the pupils, some controlled substances dilate the pupils. You're looking at the redness of the eyes.

"Sure, your eyes will get glassy and bloodshot if you're—for hay fever or lack of sleep, but marijuana does something—they're kind of—your eyes are bloodshot and they're kind of puffy. The veins are more of a spider web vein that you'll normally see in someone who's under the influence of—or, someone who's tired or with hay fever, it's a different look."

---

[1] Under OEC 702, where "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

Having explained that he was "trained to recognize the way the body responds to various different controlled substances," the officer was later asked whether, when he made contact with defendant and Williams at the scene of the collision, he "notice[d] anything about those individuals that concerned [him] as a peace officer." He testified as follows:

"A. I noticed that [defendant] and Ms. Williams displayed signs that are associated from the use of alcohol and a controlled substance, which is marijuana.

"Q. Okay. And what was it that you saw that led you to identify those two things?

"A. Well, their pupils were dilated and they had the spider web, puffy, red, bloodshot eyes that is common in that you see in someone who has smoked marijuana.

"Q. Okay. And the bloodshot, puffy, spider webbed eyes that you talk about, based on your training and experience is that consistent with recent use?

"A. Yes, it is.

"Q. Okay. What was it about them that made you suspect they were under the influence of alcohol as well?

"A. The strong odor of alcohol coming from—

"Q. Okay. Was there anything else?

"A. Just—I'd have to refer to my notes, but I remember the glassy eyes, the alcoholic beverage on their breath and their bloodshot eyes with dilated pupils.

"Q. Okay. And what about the defendant * * *?

"A. He also had odor of alcohol on his breath, the puffy, spider web, bloodshot eyes and dilated pupils."

As noted, the officer recounted that Williams openly admitted to having been drinking alcohol and that she had smoked marijuana the day before. According to the officer, defendant avoided his questions regarding the use of alcohol and controlled substances and refused to perform field sobriety tests. However, after he had been arrested for DUII, defendant agreed to provide both a urine and blood sample and "admitted that he had drank a couple beers during the day and that he had smoked marijuana earlier in the day

and [stated] that he was a medical marijuana card holder and it was his medicine." At the end of direct examination, the state asked Burge for his opinion, based on his training and experience, regarding whether defendant had been impaired at the time the officer made contact with him. The officer responded, "There is no doubt in my mind he was impaired by both alcohol and a controlled substance, the marijuana."

On cross-examination, defendant again asked Burge about the training he had received:

"Q. Officer Burge, you indicated * * * you've attended a number of classes designed to help you in conducting DUII investigations; is that correct?

"A. Yes.

"Q. Are those * * * taught by police officers or former police officers, generally?

"A. Those are taught by police officers, doctors, oh, even college professors, people [who] do research on people who are under the influence of alcohol and/or drugs."

Ultimately, the jury found defendant guilty of all of the charges.

As noted, defendant appeals the resulting judgment and asserts that the trial court erred in admitting the officer's "opinion, based on his training and experience," that "defendant was under the influence of marijuana." In defendant's view, that testimony constituted scientific evidence for which the state had not laid "a foundation establishing the evidence's scientific validity."

The state responds that the trial court correctly admitted the evidence as nonscientific expert opinion testimony. It emphasizes that "[n]othing in [the officer's] testimony was suggestive of any scientific methodology." According to the state, "the testimony here—opinion based on physical symptoms of bloodshot eyes and dilated pupils—was of the type rationally based on [Burge's] observations that could be offered by a lay person with experience observing people under the influence of the drug." Therefore, the trial court "properly rejected defendant's challenge to the admission of the officer's opinion." We "review the question

of whether evidence is 'scientific,' and, if so, whether it is admissible, for errors of law." *State v. Sampson*, 167 Or App 489, 495, 6 P3d 543, *rev den*, 331 Or 361 (2000). Based on that review, we agree with the state that the testimony in question is not scientific evidence.

"Scientific" evidence is

"evidence that draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give the evidence its reliability or accuracy."

*State v. Brown*, 297 Or 404, 407-08, 687 P2d 751 (1984). As the Supreme Court explained in *State v. Marrington*, 335 Or 555, 562, 73 P3d 911 (2003), the key question in determining whether testimony is scientific in nature is "whether the expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions." (Internal quotation marks omitted.) In short, "whether proffered expert testimony is scientific evidence, requiring an appropriate foundation, depends primarily on whether the trier of fact will perceive the evidence as such." *Id.* at 561.

In support of his contention that the testimony at issue in this case is inadmissible scientific evidence, defendant points to our opinions in *Sampson*, *Aman*, and *State v. Rambo*, 250 Or App 186, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013). In *Sampson*, we considered the question whether the DRE protocol[2] is "scientific evidence subject to

---

[2] As explained in *Sampson*, the "DRE protocol" consists of the following 12 steps:

"1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

"2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

"3. The DRE officer conducts a preliminary physical examination: he or she checks the subject's eyes for synchronization and pupil size, checks the pulse, and asks general health questions. This step determines whether the subject is impaired by a medical condition.

"4. The DRE officer conducts *** standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

the judicial gatekeeping function." 167 Or App at 496. We concluded that, "to the extent a DRE protocol is convincing on the issue of whether a defendant was under the influence of a controlled substance, that persuasive force emanates predominantly from the substance *and* the aura of the scientific principles on which its methodology is based." *Id.* at 497 (emphasis in original). Thus, we concluded that such evidence is scientific. Although we held that "the procedure and results of the DRE protocol are admissible in a DUII-[controlled substance] proceeding to show that the defendant was under the influence of a controlled substance," we noted that the state must establish a proper foundation for the evidence. *Id.* at 512.

In *Aman*, we were presented with the issue whether the results of an incompletely administered DRE protocol were "admissible as scientific evidence to prove that a defendant was under the influence of a controlled substance." 194 Or App at 465. We concluded that an incompletely administered protocol is not admissible as scientific evidence, observing that, in *Sampson*, we had "approved the 12-step DRE protocol as scientific evidence because its *complete* administration by a competent examiner qualified for admission as scientific evidence." *Id.* at 472 (emphasis added). We noted, however, that "evidence of individual tests or observations

---

"5. The DRE officer conducts four FSTs: the Romberg balance test, the walk and turn test, the one leg stand test, and the finger to nose test.

"6. The DRE officer checks the subject's pulse, blood pressure, and body temperature.

"7. The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

"8. The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

"9. The DRE officer inspects for injection sites.

"10. The DRE officer conducts a focused interrogation and observation of the subject's behavior.

"11. Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

"12. The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer."

167 Or App at 494-95 (footnotes omitted).

that are components of the DRE protocol" were not necessarily inadmissible "as nonscientific evidence of drug impairment or some other condition." *Id.* at 473.

Thereafter, in *Rambo*, we were presented with

"the previously unexamined issue of whether a police officer's opinion that a defendant was under the influence of a controlled substance is admissible where it is based on a foundation that includes certain evidence that is encompassed in a DRE test, but where evidence of the DRE protocol itself is inadmissible because the protocol was not completed."

250 Or App at 191-92. In that case, the defendant challenged the admissibility of an officer's opinion, based on elements of the DRE protocol, that she had driven under the influence of a particular controlled substance. In the defendant's view, the officer's opinion "constituted scientific evidence" because it was "based on portions of a series of tests that formed [the officer's] procedure." *Id.* at 192 (internal quotation marks omitted). We disagreed, concluding that the testimony was properly admitted as nonscientific expert opinion evidence. Comparing the case to *Aman*, we explained:

"In *Aman*, the vice of admitting opinion evidence of an incompletely administered DRE protocol was that the DRE not only had testified at length about his training and experience, *he also testified at length about the details of the 12-step protocol.* In contrast, here, the evidence showed that [the officer] was qualified, by virtue of considerable training and experience, to recognize the symptoms of drug impairment in the course of a DUII investigation. Based on such training and experience, police officers can—and frequently do—testify as to their opinions of whether an individual was under the influence of alcohol or a controlled substance. The fact that they may rely in part on *independently admissible* scientific evidence, such as blood alcohol content and HGN test results, to reinforce their opinions, does not render those opinions inadmissible as unqualified scientific evidence.

"Although the line we draw may be fine, it is not artificial. Specialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science."

*Id.* at 194-95 (internal quotation marks and citations omitted; second emphasis in original; first emphasis added). Thus, we concluded that the trial court had not erred in admitting the evidence in question, which included testimony regarding the defendant's pupil size.

Finally, in *State v. Beck*, 254 Or App 60, 292 P3d 653 (2012), the defendant was charged with driving under the influence of a combination of intoxicating liquor and a controlled substance after a traffic stop. The officer who stopped the defendant "smelled a 'light' odor of alcohol and noticed that [the] defendant's eyes were bloodshot, watery, and that he had droopy eyelids." *Id.* at 61. The defendant also told the officer that he had had "'a couple drinks while at the bar.'" *Id.* The officer asked the defendant to perform field sobriety tests, and the defendant agreed. During the administration of those tests, the officer observed that the defendant had leg tremors and his eyelids trembled, both of which can be an indication of use of a controlled substance in addition to alcohol. During the field sobriety tests, the officer also "noticed that [the] defendant's pupils appeared to be dilated." *Id.* at 62. Then, while "still at the scene of the stop, [the officer] measured [the] defendant's pupils using a 'pupilometer,' and found that both pupils were 'dilated for the lighting conditions.'" *Id.* The defendant informed the officer that he had smoked marijuana the day before. After the defendant's arrest, a breath test showed a BAC of .010 percent and, therefore, the officer "did not perform a DRE evaluation on defendant." *Id.*

The defendant contended that "the marijuana-related evidence was inadmissible to show that defendant was under the influence of a controlled substance because it misleadingly conveyed the stature of an approved scientific methodology in that the methodology had not been completed." *Id.* at 63. We rejected the defendant's challenge to the admission of that evidence. First, we concluded that "at least some of the evidence was nonscientific expert opinion evidence that was admissible under OEC 702." *Id.* at 68. In particular, we stated that "some, or most, of the FSTs that [the officer] administered may have been admissible under OEC 702, because they were neither part of the DRE protocol nor otherwise suggestive of a scientific method." *Id.* at 70.

However, we observed that the evidence relating to the dilation of the defendant's pupils in that case was more problematic. In particular, we noted that the pupil dilation evidence at issue—the determination of pupil size under varying light conditions—was a part of the DRE protocol that could only be administered by a DRE officer. We observed that, in *Rambo*, "we approved the trial court's admission as nonscientific expert evidence of an officer's testimony about the defendant's pupil size." *Id.* at 71. However, in *Rambo*, the trial court had excluded the type of pupil dilation evidence in question in *Beck*. In particular, it had excluded evidence of "the darkroom test" which measures "pupil size under varying light intensities." *Id.* (internal quotation marks omitted). Nonetheless, we concluded that, even if the "pupil-dilation evidence was scientific in nature," the defendant's challenge to its admission was not well-taken. *Id.* We observed that the officer testified, based on his training and experience, that "dilated pupils are indicators of *possible* consumption of a controlled substance" and that, because of the "narrow purpose for which the marijuana-related evidence was proffered and received, the trial court did not improperly infer that the eye-dilation evidence was part of a scientific protocol that [the] defendant was under the influence of a controlled substance at the time of the offense." *Id.* at 71-72 (internal quotation marks omitted; emphasis in original).

Returning to the evidence in question in this case, as noted, like the officer in *Rambo*, Burge was certified as a DRE. However, that fact does not make his testimony "scientific" in nature. Burge did not testify regarding his DRE certification nor did he identify himself as a DRE. Rather, as we held was permissible in *Rambo*, Burge testified regarding his extensive training and experience which demonstrated that he was "qualified, by virtue of [that] training and experience, to recognize the symptoms of drug impairment in the course of a DUII investigation." 250 Or App at 194. Furthermore, Burge did not administer the DRE protocol to defendant when investigating whether defendant was under the influence. Thus, as in *Rambo*, and in contrast to *Aman*, Burge did not testify about the details of the 12-step DRE protocol. Instead, he testified regarding his observations that defendant had dilated pupils and red, puffy "spider web"

eyes which, in his training and experience, were associated with marijuana use and testified, based on his training and experience, that, in his opinion, defendant was under the influence of marijuana. Again, as we said in *Rambo*, based on training and experience, police officers can "testify as to their opinions of whether an individual was under the influence of alcohol or a controlled substance." 250 Or App at 194. Burge's testimony in this case did not purport to draw its convincing force from principles of science; rather, it drew "its force from that training and experience." *Id.* at 195.

We further note that the evidence offered regarding defendant's dilated pupils is different in quality from that at issue in *Beck*, which we suggested was "problematic." 254 Or App at 70. Again, that evidence was that the officer measured the defendant's "pupils using a 'pupilometer,' and found that both pupils were 'dilated for the lighting conditions.'" *Id.* at 62. Here, unlike in *Beck*, Burge did not perform or testify about any testing of the dilation of defendant's pupils. Instead, he merely testified that, when he came into contact with defendant, he observed that defendant's pupils were dilated and that, in his training and experience, such dilation was consistent with marijuana use. As in *Rambo*, that evidence was not improper scientific evidence.

Finally, we note that defendant places particular emphasis on the officer's use of the term "research" in his testimony. In particular, defendant points out that Burge testified that the classes in which he had been trained were taught "by police officers, doctors, oh, even college professors, people [who] do research on people who are under the influence of alcohol and/or drugs." In defendant's view, Burge thereby "used the vocabulary of science" and "the jury would have perceived his testimony's scientific basis." We reject that contention. We note, first, that the testimony in question was elicited on cross-examination by defendant, who asked Burge who had taught the classes in which Burge had received training in conducting DUII investigations. The state asserts—and we agree—that defendant "cannot retroactively render the officer's opinion inadmissible by himself eliciting information from the officer on cross-examination that he now claims added a scientific flavor to the officer's testimony." Moreover, in our view, the passing reference in

Burge's testimony to "people [who] do research" as having taught his classes would not have announced to the trier of fact in this case that the basis of Burge's testimony was scientific.

In sum, in our view, Burge's testimony did not "possess significantly increased potential to influence the trier of fact as scientific." *Marrington*, 335 Or at 562 (internal quotation marks omitted). The evidence presented was not suggestive of a scientifically based protocol "nor did he suggest that his conclusions had been reached through the application of a scientific method to collected data." *Rambo*, 250 Or App at 195. Instead, the persuasive force of Burge's testimony was from Burge's training and experience, and the trial court did not err in admitting it under OEC 702 as nonscientific expert opinion evidence.

Affirmed.