Argued and submitted November 15, 2011, affirmed May 31, 2012, petition for review denied January 24, 2013 (353 Or 447)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**SHAUNA DAWN RAMBO,**
*Defendant-Appellant.*

Multnomah County Circuit Court
080748531; A143380

279 P3d 361

Erik M. Blumenthal, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.

BREWER, J.

**BREWER, J.**

Defendant appeals from a judgment convicting her, after a jury trial, of driving under the influence of a controlled substance, ORS 813.010, reckless driving, ORS 811.140, and failure to appear on a criminal citation, ORS 133.076. In a single assignment of error, defendant asserts that the trial court erred in admitting as nonscientific expert opinion evidence or, alternatively, as lay opinion evidence, a police officer's testimony that, in his opinion, defendant had driven her vehicle while under the influence of a narcotic analgesic. We affirm.

Defendant was arrested for the charged offenses by Officer McKinlay, who stopped her vehicle after observing various problems with her driving. McKinlay made certain observations and performed field tests, after which he concluded that defendant was impaired by a substance other than alcohol. McKinlay then arrested defendant and transported her to a police station for additional testing. At the station, another officer administered a Breathylizer test to defendant. During questioning leading up to the test, defendant admitted to "bad" driving and having taken 70 milligrams of methadone. The breath test indicated a 0.0 percent blood-alcohol content (BAC). Defendant also provided a urine sample, but, because the sample was clear and cold, the officer did not believe that it was urine. When he asked defendant to submit a second sample, she refused.

Defendant was next examined by Officer Johnson, a drug recognition evaluation (DRE) expert. Johnson testified in an offer of proof at a pretrial hearing to determine the admissibility of his testimony. Johnson had extensive training both in class and with live participants and had undertaken more than 1,000 DUII investigations. Johnson was an instructor at the police academy, where he taught about drug categories and symptomology. He is required to maintain an 80 percent accuracy rate of detecting intoxication.

Pursuant to the DRE testing procedure, Johnson conducted various sobriety tests that had been clinically tested by the National Highway Traffic Safety Administration (NHTSA) and were a "standard for investigating DUII

and whether it be controlled substances or alcohol." Among other components, he conducted horizontal gaze nystagmus (HGN) and vertical gaze nystagmus (VGN) tests that reflected that defendant had no nystagmus, a finding that was consistent with being under the influence of a narcotic analgesic. He also administered a modified Romberg sobriety test, where defendant estimated the passage of time accurately but had some circular sway in her stance. Johnson had observed those results with people who were under the influence of a narcotic analgesic. During a walk and turn test, defendant had difficulty maintaining the correct instructional position and maintaining a proper heel-to-toe walk. During a one-legged stand test, defendant had difficulty balancing and counted 23 seconds as 30 seconds. According to Johnson, of the seven recognized drug categories, only narcotic analgesics and central nervous system depressants cause an internal clock slowdown. Defendant also missed her nose several times when Johnson conducted a finger-to-nose test. Johnson also observed that defendant had constricted pupils, which, of all the drug categories, could only be caused by narcotic analgesics.

At two separate points in his examination, Johnson checked defendant's pulse rate, which was low enough in his estimation to indicate narcotic analgesic use. He also checked defendant's blood pressure and body temperature and found them to be low, again indicating narcotic analgesic use. Johnson then tested the dilation of defendant's pupils when she was placed in a dark room. He found that her pupils were smaller than normal, indicating narcotic analgesic use. He next examined her muscles and determined that they were looser than one would expect absent narcotic analgesic use. Johnson also observed older needle marks on defendant's body. In addition, defendant admitted to Johnson that she had taken 70 milligrams of methadone pursuant to her doctor's orders. Johnson performed 11 steps of the 12-step process for conducting a DRE. Johnson did not assess the results of the urine test. Johnson concluded, on the basis of his tests, his interaction with defendant, and defendant's statements, that defendant was under the influence of a narcotic analgesic. According to Johnson, the absence of a urinalysis was immaterial to the formation of his opinion, because he had

reached that opinion long before urinalysis results could have been obtained from the state crime laboratory.

After the state made the foregoing offer of proof at the pretrial hearing, defendant objected to the admission of Johnson's testimony about the DRE protocol and any opinions that he had reached based on his administration of that protocol. Defendant asserted that, because Johnson failed to obtain the results of a urinalysis, the protocol was incomplete, and evidence of his opinion was inadmissible under this court's decision in *State v. Aman*, 194 Or App 463, 95 P3d 244 (2004), *rev dismissed as improvidently allowed*, 339 Or 281 (2005). The state countered that Johnson's opinion was admissible either as nonscientific expert testimony or lay opinion testimony. Defendant replied that the evidence was not admissible on the bases for which the state advocated because, regardless of labeling, the DRE protocol was scientific evidence. Moreover, defendant asserted that the evidence was inadmissible under OEC 403 because of its unfairly prejudicial effect insofar as it bore a false imprimatur of science.

In a lengthy and carefully reasoned ruling, the trial court concluded that, because no urinalysis results were assessed, Johnson could not testify to any of the DRE protocols, either specifically or as a whole. However, the court ruled that, if an adequate foundation was laid, Johnson could testify to his opinion based on and relating to defendant's blood alcohol content, her statements, the HGN test, her performance on the field sobriety tests, her pupil size, and the needle injection sites on her body. The court concluded that such an opinion was admissible as nonscientific expert opinion evidence or, alternatively, as lay opinion evidence. In contrast, the court excluded opinion evidence based on defendant's pulse rate, temperature, the dark room test, and the muscle examination under OEC 403, on the ground that the unfairly prejudicial effect of that evidence, insofar as it suggested a scientific basis, substantially outweighed its probative value.

At trial, Johnson opined, based on the evidence that the court ruled admissible, that defendant had driven under

the influence of a narcotic analgesic. As noted, the jury convicted defendant. On appeal, the parties reprise their arguments before the trial court.

The DRE protocol "is a 12-step procedure performed by a trained officer that purports to determine whether a subject is under the influence of a controlled substance." *State v. Sampson*, 167 Or App 489, 491, 6 P3d 543, *rev den*, 331 Or 361 (2000). We have described those steps as follows:

"1.  A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

"2.  The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

"3.  The DRE officer conducts a preliminary physical examination: he or she checks the subject's eyes for synchronization and pupil size, checks the pulse, and asks general health questions. This step determines whether the subject is impaired by a medical condition.

"4.  The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

"5.  The DRE officer conducts four FSTs [field sobriety tests]: the Romberg balance test, the walk and turn test, the one leg stand test, and the finger to nose test.

"6.  The DRE officer checks the subject's pulse, blood pressure, and body temperature.

"7.  The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

"8.  The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

"9.  The DRE officer inspects for injection sites.

"10.  The DRE officer conducts a focused interrogation and observation of the subject's behavior.

"11. Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

"12. The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer."

*Id.* at 494-95 (citing NHTSA, "Drug Evaluation and Classification Training Student Manual," at IV-3 to IV-22 (1993)) (footnotes omitted); *see also* OAR 257-025-0012(3) (noting the existence of the same).

In *Sampson,* we concluded that the procedure and results of the DRE protocol are admissible as scientific evidence in a DUII-controlled substance prosecution to show that a defendant was under the influence of a controlled substance. *Sampson,* 167 Or App at 512. We noted, however, that the state still must establish, in each case, that the DRE officer was properly qualified to administer the protocol, that the officer administered it properly, and that the results were accurately recorded. *Id.* As we have explained before, the admissibility of the complete DRE protocol as scientific evidence does not demonstrate the general admissibility of each component of the protocol. Rather, "in *Sampson,* we approved the 12-step DRE protocol as scientific evidence because its complete administration by a competent examiner qualified for admission as scientific evidence * * *." *Aman,* 194 Or App at 472. Further, in *Aman,* we concluded that an incompletely administered DRE protocol is not admissible as scientific evidence, although we noted that evidence of individual components of the DRE protocol were not necessarily inadmissible as nonscientific evidence of impairment. *Id.* at 473; *see also State v. Hernandez,* 227 Or App 319, 324, 206 P3d 197 (2009) (rejecting the state's argument that individual components of an incomplete DRE protocol were admissible as nonscientific expert evidence where the state failed to identify which elements of the protocol were nonscientific).

This case presents, on a well-developed record in the trial court, the previously unexamined issue of whether a police officer's opinion that a defendant was under the influence of a controlled substance is admissible where it is based

on a foundation that includes certain evidence that is encompassed in a DRE test, but where evidence of the DRE protocol itself is inadmissible because the protocol was not completed. Because we conclude that the trial court properly admitted the challenged testimony as nonscientific expert opinion evidence, we need not consider whether it qualified for admission as lay opinion evidence.

We begin by noting what is not in dispute on appeal. Defendant does not challenge the admissibility of any of the underlying evidence upon which Johnson based his ultimate opinion. So, for example, defendant implicitly acknowledges that, based on the foundation that was laid, the HGN evidence was admissible scientific evidence.[1] The same is true for the results of the blood alcohol test.[2] Moreover, defendant's statements to the officers qualified as admissions, and they were independently admissible, as were the results of the field sobriety tests. *See State v. Anderson*, 148 Or App 325, 940 P2d 246, *rev den*, 326 Or 43 (1997) (Evidence of a defendant's physical performance of field sobriety tests is admissible in DUII prosecution.).

What defendant does challenge is the admissibility of Johnson's opinion, based on that underlying evidence, that defendant drove under the influence of a narcotic analgesic. According to defendant, regardless of labeling, Johnson's ultimate opinion constituted scientific evidence, because it was based on portions of "a series of tests that formed his 'procedure.'" As noted, in reaching his opinion, Johnson relied in part on scientific evidence such as blood alcohol and HGN evidence. He also couched his testimony in terms of his investigative accuracy rate. As defendant sees things, "[e]ven

---

[1] HGN test evidence is "scientific" evidence. *State v. O'Key*, 321 Or 285, 297, 899 P2d 663 (1995). Where its admissibility is challenged, we evaluate whether the state established the "foundational showing that the officer who administered the test was properly qualified, the test was administered properly, and the test results were recorded accurately," in order to admit the scientific evidence as a valid indicator of impairment. *Id.* at 322-23. Scientific validity depends on the reliability of the methods and procedures used to produce the evidence. *Id.* at 301-02. "The validity of HGN test evidence depends in part on the examining officer's ability to administer the test, to interpret the test results, and to relate accurately his or her perceptions." *Id.* at 318.

[2] If a proper foundation is laid, blood alcohol evidence is admissible as scientific evidence. *State v. Clark*, 286 Or 33, 593 P2d 123 (1979).

if there were mixed scientific and nonscientific components, the end result is that [Johnson] was integrating scientific tests to form a larger scientific conclusion, giving the imprimatur of science to his opinion when his opinion has not been established as scientific absent a urinalysis."

Under OEC 702, where "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." In *State v. Marrington*, 335 Or 555, 561-63, 73 P3d 911 (2003), the Supreme Court held that the key question in determining whether proffered testimony is "scientific," and thus requires a special foundation, is "whether the expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions." *Id.* at 562 (internal quotation marks omitted). In *Marrington*, the state offered the expert testimony of a psychologist that the alleged victim displayed "a very prevalent characteristic of abused children in her delayed reporting." *Id.* at 558. Among other credentials, that witness testified that she had "undergraduate and postgraduate degrees in the field of psychology, a behavioral science" and claimed "that her knowledge is based on studies, research, and the literature in the field." *Id.* at 562-63. The court noted that

"[a]n expert * * * who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field, announces to the factfinder that the basis of her testimony is 'scientific,' *i.e.*, is grounded on conclusions that have been reached through application of a scientific method to collected data."

*Id.* at 563-64; *see also State v. Perry*, 347 Or 110, 120-21, 218 P3d 95 (2009) (testimony of a witness presenting herself as an expert in her field whose knowledge was based, at least in part, on studies, research, and scientific literature, is scientific evidence and must comply with the standard described in *O'Key* for admission of such evidence).

In *State v. Clemens*, 208 Or App 632, 145 P3d 294 (2006), *rev den*, 342 Or 299 (2007), we applied that principle

to resolve a challenge to opinion testimony by a police officer that a sex abuse victim's statement was generally consistent with the nonchronological reporting patterns of child abuse victims. The defendant asserted that the testimony was inadmissible scientific opinion evidence for which a proper foundation had not been laid. We disagreed:

> "In contrast to *Marrington*, the record here establishes that [the officer] had relevant training and experience in the area of child sexual abuse investigations, but not that he had any relevant or specialized education or knowledge in the field of psychology and child behavior. The disputed portion of his testimony, moreover, did not 'involve the vocabulary of scientific research.' Nothing in [the officer's] testimony suggested to the court that his opinions were 'grounded on conclusions that have been reached through application of a scientific method to collected data.' Further, by its comments the court made clear that it was aware of the difference between testimony based on personal experience, such as that provided by [the officer], and testimony that is scientific in nature. Based on the record as a whole, then, we conclude that [the officer's] disputed statement retained no 'increased potential' to influence the trier of fact as a scientific assertion. We hold, therefore, that the trial court did not err in concluding that the disputed testimony was not scientific evidence."

*Clemens*, 208 Or App at 638-39.

In *Aman*, the vice of admitting opinion evidence of an incompletely administered DRE protocol was that the DRE officer not only had testified at length about his training and experience, he also testified at length about the "details of the 12-step protocol." *Aman*, 194 Or App at 471. In contrast, here, the evidence showed that Johnson was qualified, by virtue of considerable training and experience, to recognize the symptoms of drug impairment in the course of a DUII investigation. Based on such training and experience, police officers can—and frequently do—testify as to their opinions of whether an individual was under the influence of alcohol or a controlled substance. *See, e.g.*, *State v. Chatelain*, 347 Or 278, 281, 220 P3d 41 (2009) ("[O]ne of the arresting officers testified that defendant 'show[ed] all the classic signs of [being under the influence of] some sort of stimulant': he 'was real fidgety,' seemed 'really, really, extremely anxious,'

and 'couldn't stop messing with his clothes.' "); *State v. Moore*, 334 Or 328, 332, 49 P3d 785 (2002) (officer "testified that, when he arrived at the scene, defendant was intoxicated"); *State v. Vantress*, 195 Or App 52, 55, 96 P3d 867 (2004) (officer "testified that defendant's leaning conduct was 'pretty common with intoxicated drivers' in his experience as an officer"); *State v. Kimsey*, 182 Or App 193, 196, 47 P3d 916 (2002) (officer testified that defendant "seemed to be intoxicated"). The fact that they may rely in part on *independently admissible* scientific evidence, such as blood alcohol content and HGN test results, to reinforce their opinions, does not render those opinions inadmissible as unqualified scientific evidence.

Although the line we draw may be fine, it is not artificial. Specialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science. Unlike in *Aman* and *Marrington*, here, the officer did not—apart from his reference to independently admissible scientific tests—rely on the vocabulary of science, nor did he suggest that his conclusions had been reached through the application of a scientific method to collected data. The trial court's ruling scrupulously sanitized the record of any evidence of a scientifically based protocol, thereby mitigating the risk that Johnson's testimony would be given unfair weight beyond the credentials that he claimed. The trial court did not err in admitting the challenged evidence.

Affirmed.