Argued and submitted November 10, 2014; convictions on Counts 1, 2, and 3 reversed and remanded; remanded for resentencing; otherwise affirmed January 27, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SOPHIA LOUISE DOWNING,
*Defendant-Appellant.*

Marion County Circuit Court
10C47430; A151627

366 P3d 1171

Meredith Allen, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Assistant Attorney General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Defendant appeals a judgment of conviction for two counts of first-degree manslaughter, ORS 163.118; one count of second-degree assault, ORS 163.175; one count of driving under the influence of intoxicants, ORS 813.010; and one count of recklessly endangering another person, ORS 163.195. To prove the manslaughter and assault charges, the state was required to demonstrate that defendant committed those crimes with an "extreme indifference to the value of human life." On appeal, defendant argues that the state failed to offer sufficient evidence to prove that element of those crimes and that the trial court gave the jury a misleading instruction about what constitutes "extreme indifference to the value of human life." Defendant also asserts that the trial court erred when it refused to suppress certain of defendant's incriminating statements. Finally, defendant contends that the trial court improperly allowed the state's expert witnesses to testify about portions of an incomplete drug recognition expert (DRE) protocol. For the reasons that follow, we conclude that the trial court did not err when it denied defendant's motions for judgments of acquittal, allowed testimony about defendant's incriminating statements, and permitted the state's experts to testify about portions of the DRE protocol. We conclude, however, that the trial court's jury instruction was erroneous and that giving that instruction prejudiced defendant. We, therefore, reverse and remand the convictions for manslaughter and second-degree assault, remand for resentencing, and otherwise affirm.

We begin by stating the relevant historical facts. We state the facts that are relevant to a defendant's motion for a judgment of acquittal in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). With respect to those facts pertinent to defendant's motion to suppress, we defer to the trial court's "findings of fact, both explicit and implicit, provided that there is sufficient evidence in the record to support them." *State v. Pettersen*, 256 Or App 385, 386, 300 P3d 277 (2013) (citing *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993), and *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)).

On the afternoon of September 23, 2010, defendant was driving north on Lancaster Avenue in Salem. School bus driver Kaufman was transporting a kindergarten class when defendant's vehicle cut in front of the bus, requiring Kaufman to slam on her brakes. Kaufman watched defendant drive over the curb and onto the sidewalk, and saw that defendant had a "glassy" stare. A few moments later, transit bus driver Duncan encountered defendant when Duncan's bus and defendant's car stopped next to each other at a stop light on Lancaster. Duncan saw that defendant had an unlit cigarette in her mouth and was digging through her purse. When the light turned green, defendant did not immediately start to move forward and Duncan drove past her.

Duncan's route took him close to Chemeketa Community College and Winema High School, which have adjoining campuses. At the intersection of Lancaster and Winema Street, there is a crosswalk across Winema. At the time that Duncan approached the crosswalk, students from Winema High School had just finished their school day and were using the crosswalk to get to a bus stop on the other side of the street.

Duncan saw defendant's vehicle reappear and pass Duncan's bus on the left at about 40 miles per hour. Defendant then swerved into the right lane in front of the bus, lost control of her car, drove off the road and onto the sidewalk, and hit a utility box. Defendant's car then continued into a crowd of students who were in the crosswalk.

Defendant struck three pedestrians with her car. One of them, Cervantes, rolled onto the hood of her car, while the other two, Green and Echeverria, were dragged under the car a short distance. A crowd of students began to gather, several called 9-1-1, and others tried to administer aid to the victims. A high school student, Fessler, began administering first aid to Green, who was nonresponsive and was bleeding from an injury on her head. A short time later, Fraker, who was a student at the prenursing program at the community college and a certified nursing assistant at Salem Hospital, took charge of aiding Green. Echeverria was conscious but unable to stand.

After parking her car, defendant approached the crowd. As she walked up to Green, defendant said that her brakes had failed. Defendant moved to touch Green and asked Fessler if Green was okay. Fessler told defendant to move back. After noting that members of the crowd had her license plate number, defendant asked Fessler if she could leave. Fessler said that defendant could not. Defendant walked to the sidewalk curb, sat down approximately one foot from Green's head, and smoked a cigarette. Fessler described defendant as "dreamy, not really all there," and Fraker testified that, as defendant sat on the curb, she said something like, "I'm going to go to jail for this."

Deputy Kinyon of the Marion County Sheriff's Office was the first police officer to arrive at the accident scene. After the paramedics arrived, Kinyon asked the crowd who the driver was. Defendant, who was crying, raised her hand and said that she was the driver. According to Kinyon, defendant seemed "shocked." Kinyon asked defendant to move away from the crowd and then asked her what had happened so that he could get a "basic overview" of the accident. She told him that the students ran in front of her car. Kinyon asked defendant where her vehicle was and she pointed to where it was parked.

It began to rain and Kinyon became concerned that the gathering crowd would become hostile toward defendant. He asked defendant whether she would mind sitting in the back of the patrol car to "get out of the rain and get away from the crowd." He then told her that she was not under arrest or even detained and asked if she understood that. Defendant said she understood, walked over to the patrol car, and sat in the back seat.

Once defendant was in the patrol car, Kinyon asked her if she had been drinking or had taken any drugs. Defendant said that she had not had anything to drink, but that she had been taking medication for anxiety. Specifically, defendant said that she had taken Lorazepam that morning. Kinyon then closed the back door of the patrol car; he also turned off the car's police radio so that defendant would not hear about the condition of the victims. Kinyon used his portable radio to broadcast that he had "detained" defendant.

After defendant was asked if she would voluntarily go to the hospital and she agreed to do so, Deputy Myers was ordered to bring defendant there. Myers told defendant that she was not under arrest and moved defendant to the back of her patrol car. Myers did not ask defendant any questions as they drove; defendant made small talk. Myers and defendant arrived at the hospital at 4:02 p.m. After defendant was checked into a treatment room, she spontaneously told Myers, "I guess I hurt two people." Myers did not tell defendant anything about the condition of the victims.

Sometime between 4:00 p.m. and 5:00 p.m., Deputy Clarke, a drug recognition expert, arrived to examine defendant for signs of drug impairment. Clarke noticed that defendant had droopy eyelids and slurred her speech and that her shirt was inside-out. Defendant consented to blood and urine tests. A blood sample was taken from defendant at 4:21 p.m. and a urine sample was taken at 4:27 p.m. Clarke read defendant *Miranda* warnings, and defendant said that she understood those warnings.

Clarke then began a DRE investigation. As part of the standardized 12-step DRE protocol, defendant performed various tests for impairment.[1] Clarke, however, only

---

[1] The following 12 steps constitute a complete DRE investigation:

"1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

"2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

"3. The DRE officer conducts a preliminary physical examination: he or she checks the subject's eyes for synchronization and pupil size, checks the pulse, and asks general health questions. This step determines whether the subject is impaired by a medical condition.

"4. The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

"5. The DRE officer conducts four FSTs: the Romberg balance test, the walk and turn test, the one leg stand test, and the finger to nose test.

"6. The DRE officer checks the subject's pulse, blood pressure, and body temperature.

"7. The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

"8. The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

undertook nine of the 12 steps in the protocol; he did not interview any of the officers who talked to defendant immediately after the accident, perform a Breathalyzer test on defendant, or test for "muscle rigidity."

Clarke asked defendant questions about the previous 24-hour period. In response to those questions, defendant told him that she had fallen asleep shortly after 10:30 p.m. the night before. Her alarm woke her at 8:30 a.m., but she went back to sleep. Defendant woke up again at 11:30 a.m. and got ready for her day. She left the house at 1:25 p.m. and drove to a cellular phone provider store to pay her bill, but discovered that the store was closed. Defendant was driving home to check on her dog when she struck Cervantes, Green, and Echeverria. Defendant also told Clarke that she took one milligram of Lorazepam at 8:00 a.m. on the day of the accident. She also stated that she took 75 milligrams of Cyclobenzaprine the night before.[2]

Clarke obtained a search warrant for a second blood draw and urine sample. Another deputy, Bennett, read the search warrant to defendant and asked her to come to the central police district office for an interview. Defendant said she needed to go check on her dog. Bennett told defendant that several people had been seriously injured and that that was more important than checking on her dog. Defendant then agreed to be interviewed. Defendant's blood was drawn a second time at 7:54 p.m. Bennett then took defendant to the central district office.

---

"9.  The DRE officer inspects for injection sites.

"10.  The DRE officer conducts a focused interrogation and observation of the subject's behavior.

"11.  Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

"12.  The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer."

*State v. Sampson*, 167 Or App 489, 494-95, 6 P3d 543, *rev den*, 331 Or 361 (2000) (citing NHTSA, "Drug Evaluation and Classification Training Student Manual," at IV-3 to IV-22 (1993) (footnotes omitted)).

[2]  Clarke noted the obvious inconsistency in defendant's statements: Defendant reported that she took Lorazepam at 8:00 a.m. even though she had earlier claimed to have been asleep until 8:30 a.m.

At the central district office, defendant met with Bennett and Detective Hingston. Bennett and Hingston allowed defendant to smoke a cigarette and then walked defendant to an interview room and Bennett read defendant her *Miranda* rights. Defendant asked, "How long will it take to get an attorney?" Bennett then asked defendant to clarify whether she wanted to have an attorney present. Defendant said that she did. Bennett said that he would stop asking defendant questions, but then began to talk to defendant about how "criminal investigations work, how these things typically happen." Bennett also told defendant that one of the persons that defendant had struck with her car had died. When defendant heard that, she began to cry. She said, "Fuck. Vehicular manslaughter." Hingston and Bennett placed defendant under arrest.

Once at the jail, defendant spontaneously said, "My Ativan and Thorazine would be great right now."[3] Hansen, a registered nurse at the sheriff's office, evaluated defendant and, based on that evaluation, believed that defendant was sedated. Defendant was then taken to the intake unit, where Deputy Garner was working. In his report, Garner indicated that defendant made several "suicidal statements" and banged her head against the wall. As a result, defendant was made to wear a suicide smock and placed on suicide watch.

Defendant, who was allowed to make a telephone call, called her grandmother and, during the call, quickly became agitated. She yelled into the phone, "How would you feel if they said you killed two people?" She then shattered the receiver by slamming it into the cradle. Deputy Williams, who was the closest law enforcement officer to defendant at the time, tried to put defendant into an escort hold. When defendant pulled away from him he "had to take her down to the ground." Deputies used a taser on defendant several times.

---

[3] Ativan is the trade name for the drug Lorazepam. Thorazine is the trade name for the drug Chlorpromazine. There is no other evidence on the record about whether defendant took Chlorpromazine prior to the accident or whether she had a condition that required that treatment.

While she was in jail, defendant talked about the accident with visitors and over the phone. On October 12, 2010, one of defendant's friends visited her in jail. During their conversation, defendant described the morning of the accident. Defendant said that she felt like she was "tripping" when she drove to go pay her cell phone bill. She said, "[A]ll I could think of was, like, I need to go pay my bill, I got to pay my bill, I got to pay my bill." Defendant also said that she did not take Lorazepam the day of the accident. On November 13, 2010, defendant called a friend and said that she felt like she was "being crucified" because "I take fucking medications." On December 2, 2010, defendant had a conversation in which she said that the written instructions that came with her prescription drugs said "not to drive unless you know the effects. It doesn't say I'm not supposed to drive at all. It says I'm not supposed to drive until I know the effects of the medication."

Ultimately, both Green and Cervantes died as a result of their injuries. Echeverria survived, but suffered a traumatic head injury, a torn aorta, and a blood clot in his left leg. Defendant was charged with two counts of first-degree manslaughter under ORS 163.005 and ORS 163.118(1)(a). Those statutes provide that a person commits that crime when that person unjustifiably causes the death of another human being and does so "recklessly under circumstances manifesting extreme indifference to the value of human life." Defendant was also charged with second-degree assault under ORS 163.175(1)(c), which provides that a person commits the crime of second-degree assault when that person "[r]ecklessly causes serious physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life." Under ORS 161.085(9), recklessly "means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." Furthermore, "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." *Id.* Defendant was also charged with driving under the influence of a controlled substance, ORS 813.010, and reckless endangerment, ORS 163.195.

Defendant filed a pretrial motion to suppress her "statements and admissions which were illegally, improperly, and involuntarily obtained." Defendant argued, among other things, that she made certain statements under compelling circumstances without first being given *Miranda* warnings and that "Detective Bennett made statements to defendant that were likely to elicit an incriminating response after defendant unequivocally invoked her right to have an attorney present during custodial interrogation[.]" After a hearing on the motion, the trial court ruled:

> "The statements that defendant made to Deputies Kinyon, Myers and Clarke, along with all other statements made at the Salem Hospital and jail intake, including statements made to Nurse Hansen are not subject to suppression on constitutional or statutory grounds. The statement defendant made to Deputy Bennett after learning that one of the victims had died is suppressed."

With respect to the statement that it did suppress, the court reasoned that, due to defendant's medical condition and the other attendant circumstances, it was reasonably likely that the detectives' comments had elicited the statement from defendant while she was in compelling circumstances.

At trial, the state introduced evidence that the urine that defendant provided at 4:27 p.m. had tested positive for Lorazepam, Cyclobenzaprine, and an active Bupropion metabolite. The blood collected at 4:21 p.m. contained a Bupropion metabolite and Lorazepam. Defendant's blood did not contain any Cyclobenzaprine at the time it was tested.

According to an Oregon State Police forensic scientist who testified at trial, Lorazepam is a central nervous system depressant that can cause impairment and negatively affect a person's ability to drive. That scientist testified, "From the studies I've reviewed, Lorazepam can cause significant impairment relating to driving and psychomotor abilities. It's been found to cause significant impairment, of course, at abusive levels, but also at therapeutic and even sub-therapeutic, which means below a therapeutic level." Another expert witness, an emergency medicine physician, testified that Cyclobenzaprine is a muscle relaxant that would have a "significant additive effect" if combined

with Lorazepam. A person under the influence of both drugs would "be very much impaired." He also testified that Bupropion is an antidepressant that does not cause impairment when taken alone and at therapeutic doses.

Defendant received her prescription for Lorazepam three days prior to the accident, on September 20, 2010. The instructions that accompanied the prescription indicate that it was prescribed for insomnia. They also provide that defendant was to take between one milligram and two milligrams of Lorazepam before bedtime. The pharmacist who counseled defendant about how to take the prescription did not remember specifically what he told her about its effects, but the warning label provides that the drug may cause drowsiness and that that effect may be intensified by drinking alcohol. The label also instructs, "Use caution when operating a car or dangerous machinery." The emergency medicine physician testified that the standard of care for emergency medicine is to tell people who take Lorazepam not to drive at all after taking the drug.

After the state rested, defendant moved for judgment of acquittal on the two first-degree manslaughter charges and on the second-degree assault charge. Defendant argued that the evidence was insufficient to prove that she acted under circumstances manifesting extreme indifference to the value of human life. The trial court denied the motion.

Defendant then called her only witness, retired anesthesiologist Dr. Julien. Julien testified that the "normal therapeutic level" of Lorazepam concentration in a patient's blood is between .01 to .24 milligrams per liter. He also explained that the concentration of Lorazepam in defendant's blood (.025 milligrams per liter) was on the very low end of that range. According to one study cited by Julien, the level of impairment associated with that amount of Lorazepam is comparable to a 140-pound person drinking one and one-half bottles of beer. In Julien's experience, that level of Lorazepam in defendant's blood could not have caused the degree of impairment observed in defendant. In addition, taking the Lorazepam as prescribed would not have caused the level of impairment described. Finally, he

testified that, because Cyclobenzaprine is metabolized relatively slowly and was not in defendant's blood when it was tested, he would not expect that drug to have been impairing defendant when she was driving.

Before the end of the trial, the court held a hearing regarding jury instructions. The state proposed an instruction on the meaning of the phrase "extreme indifference to the value of human life." The instruction read, in part, "[c]onduct manifesting extreme indifference to the value of human life displays indifference or lack of concern for social and legal responsibility." It further provided that, "[i]n determining whether the defendant's conduct manifested an extreme indifference to the value of human life, you should consider all the circumstances which reflect on her concern or lack of concern for her social and legal responsibility." Defendant took exception to that instruction's use of the phrase "lack of concern for social and legal responsibility." Defendant argued that the instruction was a misstatement of the law because the jury is required to specifically assess her level of concern for the value of human life, not her concern for a broader category of legal and social responsibilities. The trial court rejected defendant's arguments and gave a modified version of the state's instruction. Ultimately, the jury found defendant guilty of all of the charges, and the trial court entered a judgment of conviction.

On appeal, defendant argues that the trial court erred in denying her motion to suppress her incriminating statements to deputies Kinyon and Clarke, asserting that both Article I, section 12, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution require the suppression of those statements. Specifically, defendant contends that Kinyon was required to give her *Miranda* warnings after he had her sit in the back of his patrol car and before he asked her whether she had consumed drugs or alcohol. In her view, the statements she made in response to his questions should have been suppressed under Article I, section 12.[4] Furthermore, she argues that the statements that she made to Clarke derived

---

[4] Article I, section 12, provides that "[n]o person shall *** be compelled in any criminal prosecution to testify against himself."

from the initial unlawful questioning by Kinyon and, therefore, that those later statements must also be suppressed.

Article I, section 12, requires that, before questioning a suspect, police must give that person *Miranda* warnings if that person is in either "full custody or in circumstances that create a setting which judges would and officers should recognize to be compelling." *State v. Roble-Baker,* 340 Or 631, 638, 136 P3d 222 (2006) (internal quotation marks omitted). To determine whether circumstances are "compelling," courts have identified a number of relevant factors, including where the questioning occurred, how long the questioning lasted, whether police pressured the defendant to answer, and whether the defendant was able to terminate the encounter. *Id.* at 640-41. Those factors, however, are not exclusive, and should not be mechanically applied. "Rather, in determining whether the police placed a defendant in compelling circumstances, this court will consider all the circumstances, and its overarching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Id.* at 641.

Under the Fifth Amendment, as made applicable to the states by the Fourteenth Amendment, police must provide a defendant with *Miranda* warnings prior to interrogating that person "in custody." *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966). A person is in custody when the person has been formally arrested or when her "freedom of movement" has been restrained to a "degree associated with a formal arrest." *California v. Beheler,* 463 US 1121, 1125, 103 S Ct 3517, 77 L Ed 2d 1275 (1983).

In this case, the state concedes that Kinyon's question about drugs and alcohol was an interrogation because it was reasonably likely to elicit an incriminating statement, but asserts that defendant was not in custody or in compelling circumstances. Defendant argues that she was at least in compelling circumstances because "Deputy Kinyon asked the driver to identify herself, and when defendant raised her hand, Kinyon immediately escorted defendant to his patrol car and shortly thereafter asked her to sit inside the patrol car, peppering her with questions throughout his

interaction." Those circumstances were compelling, according to defendant, because a reasonable person would have understood herself to be subject to a criminal investigation and also not free to leave the scene.

We are unpersuaded by defendant's argument. First, the record does not support defendant's characterization that Kinyon peppered her with questions at the scene of the accident. Before placing her in the back of the patrol car, Kinyon asked defendant a few basic questions about the accident such as whether she was the driver, how the accident occurred, and where her car was parked. After placing her in his patrol car, he asked whether she had been drinking or had taken any drugs that day. Kinyon's interrogation of defendant was limited in scope and duration.

Second, although placing defendant in the back of his patrol car certainly somewhat restrained defendant's freedom of movement, "[a] minimal level of restraint, without more, does not constitute compelling circumstances." *State v. Bayer*, 229 Or App 267, 274, 211 P3d 327, *rev den*, 347 Or 446 (2009). Furthermore, the other attendant circumstances do not suggest a police-dominated environment: Kinyon asked, but did not compel, defendant to sit in the back of his patrol car; he did not place her in restraints; and he specifically told her that she was not under arrest and not detained. Some of Kinyon's actions appear to have been calculated to reduce the amount of psychological pressure on defendant, rather than to increase it. Kinyon testified that he moved defendant to his patrol car to separate her from the gathering crowd, which he feared would become hostile toward defendant. Furthermore, he turned off the car's police radio so that defendant would not learn about the extent of the victims' injuries. *Cf. State v. Werowinski*, 179 Or App 522, 532, 40 P3d 545, *rev den*, 334 Or 632 (2002) (compelling circumstances existed when officer directed the defendant to his patrol car, told the defendant that he was detained until the officer could speak with witnesses, left the defendant in the patrol car for 10 to 15 minutes, and then returned and confronted the defendant with the incriminating evidence that he had gathered from the witnesses).

For those reasons, we conclude that Kinyon's question to defendant about drugs and alcohol did not occur under compelling circumstances. We reach the same conclusion under the Fifth Amendment analysis. Defendant was not restrained to a degree that is comparable to a formal arrest. *Beheler*, 463 US at 1125. And, because there was no initial unlawful questioning, defendant's subsequent statements to Clarke did not derive from an illegality.

Defendant also asserts that the trial court erred in denying her motion for judgment of acquittal and in its instruction to the jury regarding extreme indifference to the value of human life. Those challenges both involve the same basic question: What does it mean to manifest an "extreme indifference to the value of human life" for the purposes of the statutes that set forth the crimes of manslaughter and second-degree assault? *See* ORS 163.118; ORS 163.175. The phrase is not defined by statute. Our prior case law has defined it as "a state of mind where an individual cares little about the risk of death of a human being." *State v. Corpuz*, 49 Or App 811, 819, 621 P2d 604 (1980); *see also State v. Alexander*, 273 Or App 659, 662, 359 P3d 516, *rev den,* 358 Or 449 (2015) (same). That understanding is consistent with the plain meaning of the phrase. *See State v. Gaines*, 346 Or 160, 170-72, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). The ordinary meaning of the term "extreme" as used in the statutes is "existing in the highest or the greatest possible degree : very great : very intense" or "exceeding the ordinary." *Webster's Third New Int'l Dictionary* 807 (unabridged ed 2002). "Indifference" means "marked by a total or nearly total lack of interest in or concern about something." *Webster's* at 1151. Thus, the plain meaning of the phrase "extreme indifference to the value of human life" is unconcern in a very high degree, exceeding the ordinary, that an act might cause the death of a human being.

The Oregon Supreme Court considered the meaning of "extreme indifference to the value of human life" in *State v. Boone*, 294 Or 630, 661 P2d 917 (1983). Like this case, *Boone* involved a serious traffic accident caused by an impaired driver. *Id.* at 639. Before the accident, the defendant was "swerving across the road, tailgating so closely

he almost hit the car in front of him[,] and passing on a curve." *Id.* Eventually, he sideswiped an oncoming vehicle, "bounced or swerved into his own lane and then swerved back across the center line into the second oncoming vehicle, causing serious injury to the passenger." *Id.* The defendant acted belligerently at the scene of the accident; he threatened "to hit the passenger of the first car he sideswiped" and interfered with the assistance that was being provided to the victim. *Id.* Among other things, the defendant was convicted of second-degree assault on the theory that he had acted with extreme indifference to the value of human life. *Id.* at 632. The defendant conceded that his conduct had been reckless, but argued that the trial court should have granted his motion for a directed verdict because the state failed to prove extreme indifference. *Id.* at 638-39.

The Supreme Court recognized that, at its core, the question whether a person has acted with extreme indifference to the value of human life asks whether the person's recklessness should be assessed as especially blameworthy. *Id.* at 635. For example, a person who "[r]ecklessly causes serious physical injury to another by means of a deadly or dangerous weapon" is guilty of third-degree assault. ORS 163.165(1)(a). But that same conduct can constitute second-degree assault, which is a more serious crime, if it is committed "under circumstances manifesting extreme indifference to the value of human life." ORS 163.175(1)(c); *Boone*, 294 Or at 635. Similarly, the blameworthiness associated with an extreme indifference to the value of human life can transform the crime of second-degree manslaughter into the crime of first-degree manslaughter. *Id.* at 635 n 12; *see* ORS 163.118(1)(a); ORS 163.125(1)(a).

The court clarified, however, that "the extreme indifference language does not create an additional culpable mental state." *Boone*, 294 Or at 634. Rather, it describes a different "level[]" of recklessness, *State v. Hill*, 298 Or 270, 280, 692 P2d 100 (1984), one that is characterized by a willingness to commit an "extremely dangerous act" and an indifference as to whether that act could cause the death of another human being, *Boone*, 294 Or at 638. To help explain the difference between recklessness and "recklessness plus the increased element of extreme indifference," the court

discussed *Hamilton v. Commonwealth*, 560 SW2d 539 (Ky 1978). *Boone*, 294 Or at 638. That case drew a distinction between the "typical automobile accident where a driver makes a gross error of judgment" and an accident in which a driver disregarded a "plain and obvious likelihood that death or great bodily injury could have resulted." *Hamilton*, 560 SW2d at 543. Accordingly, in *Boone*, the court concluded that the defendant's "degree of intoxication, defendant's erratic driving[,] and his conduct at the scene of the accident" distinguished the facts in *Boone* from "cases of reckless assault." *Boone*, 294 Or at 639.

With that background in mind, we turn to defendant's challenge to the trial court's denial of her motion for a judgment of acquittal. In reviewing that ruling, our task is "to determine whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *State v. Rocha*, 233 Or App 1, 5, 225 P3d 45 (2009), *rev den*, 348 Or 461 (2010). According to defendant, a rational trier of fact could not have found her guilty of either the manslaughter or assault charges, because the state failed to offer any evidence that she acted with "extreme indifference to the value of human life." She argues that "[t]he near collision and statements such as that she felt like she was tripping before she drove are evidence that she knew of her impaired state, but that is simply evidence of recklessness[.]" She also argues that there is evidence from which a trier of fact could conclude that she was concerned for the victims; defendant points out that she "stopped and remained at the scene, identified herself as the driver, complied with officer directions, cooperated with the investigation, asked several times about the condition of the victims, and expressed emotion and concern about the victims."

We are unpersuaded by defendant's characterization of the evidence in the record. First, defendant's conduct on the day of the accident supports two separate inferences about her mental state: Defendant's decision to drive was indicative both of a reckless state of mind and of an indifference to the value of human life. In the light most favorable to the state, there was evidence that defendant felt impaired, but decided to drive anyway because she wanted to pay her mobile phone bill. She did so even though she had recently

taken Lorazepam at 8:00 that morning and had been cautioned about operating a vehicle while on that particular drug. Furthermore, defendant's erratic driving is comparable to the defendant's driving in *Boone*, which the Oregon Supreme Court considered to be evidence of extreme indifference to the value of human life. 294 Or at 639. Defendant continued to drive while impaired after swerving in front of a bus and driving over a curb and onto a sidewalk. She repeated that same highly dangerous conduct moments later.

We also disagree that defendant's conduct after the accident is indisputable evidence of her concern for the victims. It is true that, at one point, defendant asked about Green's condition. However, she also asked Fessler and Fraker, who were administering aid to an obviously very seriously injured person, if she could leave the scene. When Fessler told defendant that she could not, defendant sat down and smoked a cigarette while seated about one foot from Green, who was lying in a pool of her own blood.

Of course, a rational juror could look at those circumstances and conclude that defendant was not extremely indifferent to the value of human life; a juror could conclude that defendant was inadequately warned about the effects of Lorazepam on one's ability to drive, or that the drug had an unusually powerful impairing effect on defendant, or that defendant's mental state following the accident was affected by the combination of shock and her anti-anxiety medication. Alternatively, however, a rational juror could reject those explanations and, instead, conclude that defendant willfully ignored the warnings about her prescription, chose to drive when she was physically unable to do so safely, and continued driving after creating a mortal danger to pedestrians by swerving onto the sidewalk, and that she was largely unconcerned by the victims' injuries. In other words, a rational juror could conclude that defendant's conduct showed extreme indifference to the value of human life—that is, extraordinary lack of concern that her actions might cause the death of a human being—when she continued to engage in reckless conduct after the first incident of pedestrian hazard showed that the reckless

conduct could result in death. Accordingly, the trial court did not err when it denied defendant's motion for a judgment of acquittal.

With respect to defendant's challenge to the trial court's jury instructions, we review for legal error. *State v. Frey*, 248 Or App 1, 3, 273 P3d 143 (2012). We will reverse a criminal conviction due to an erroneous jury instruction only when the instruction prejudiced the defendant. *Id.* Put another way, cases are not reversed based on instructional error "unless the appellate court can fairly say that the instruction probably created an erroneous impression of the law in the minds of the [jurors] which affected the outcome of the case." *State v. Thompson*, 328 Or 248, 971 P2d 879, *cert den*, 527 US 1042 (1999) (internal quotation marks omitted).

In this case, the jury was instructed, in pertinent part, that, in order to establish the crime of first-degree manslaughter, the state had to prove beyond a reasonable doubt that defendant caused the death of Cervantes and Green "unlawfully and recklessly" and "under circumstances manifesting extreme indifference to the value of human life." The court also instructed the jury that, to establish the crime of second-degree assault, the state was required to prove beyond a reasonable doubt that defendant "recklessly caused serious physical injury to * * * Echeverria by means of a dangerous weapon" and that she did so "under circumstances manifesting extreme indifference to the value of human life."

The trial court explained that, as applied to the first-degree manslaughter allegations against defendant, "recklessly means that person is aware of and consciously disregards a substantial and unjustifiable risk of causing a result, death." With respect to the second-degree assault charge, the court explained that "recklessly means that person is aware of and consciously disregards a substantial and unjustifiable risk of causing a result, serious physical injury." The court also informed the jury that "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

The court instructed the jury that the phrase "extreme indifference to the value of human life" means as follows:

"Extreme indifference to the value of human life requires more than mere recklessness. Conduct manifesting extreme indifference to the value of human life displays indifference or a lack of concern for social or legal responsibility. Extreme indifference describes a heightened degree of blameworthiness in the circumstances of Defendant's conduct. It does not create an additional culpable mental state.

"In determining whether the Defendant's conduct manifested an extreme indifference to the value of human life, you should consider all the circumstances which reflect on her concern or lack of concern for her social and legal responsibilities, such as the nature of the Defendant's driving, the extent of her impairment, her conduct at the scene, and the attitude she displayed toward the consequences of her act."

On appeal, defendant argues that

"[t]he trial court's instruction defining 'under circumstances manifesting extreme indifference to the value of human life' was erroneous, because it told the jury that it could find the element based on the mere failure to meet social and legal responsibilities. The instruction failed to convey that the failure to meet those responsibilities must be extreme and related to the value of human life."

Defendant argues that that instruction was prejudicial because "it allowed the jury to convict defendant of first-degree manslaughter and second-degree assault upon a finding of lesser culpability than is required."

In response, the state argues that

"[t]he court did not instruct the jury that indifference or lack of concern for social or legal responsibility automatically constitutes extreme indifference for the value of human life. Rather, it instructed the jury that an extreme indifference for the value of human life *displays* a lack of concern for social or legal responsibility."

(Emphasis in original; footnote omitted.) The state also argues that there was no prejudice because,

"[b]y dint of the court's instructions regarding 'reckless-ness,' the jury already was required to conclude, in order to convict defendant of the charged offenses, that she con-sciously disregarded a substantial and unjustifiable risk that death or serious physical injury would occur as a con-sequence of her driving. That finding, in and of itself, con-stituted a conclusion that defendant's conduct reflected cir-cumstances manifesting extreme indifference to the value of human life."

The state is correct that the court's use of the word "displays" makes the meaning of the instruction somewhat more ambiguous. However, the jury was not informed only that extreme indifference "displays a lack of concern for social and legal responsibility." It was also told that it should "consider all the circumstances which reflect on her concern or lack of concern for her social and legal responsibilities." There is nothing else in the instructions that gives guidance in determining whether a person is extremely indifferent to the value of human life.

That instruction misstates the law. Extreme indif-ference to the value of human life is a state of mind that is both more blameworthy than plain recklessness and that specifically relates to whether one cares about the death of another human being. The trial court's instruction does not describe either of those characteristics. It does not explain that extreme indifference to the value of human life describes a state of mind about whether a person cares that the person's conduct might cause the death of another human being. Furthermore, the instruction does not explain how, in the context of the crimes alleged against defendant, the phrase extreme indifference to the value of human life relates to the mental state of recklessness.

In the statutes that define the crimes of first-degree manslaughter and second-degree assault, the phrase "extreme indifference to the value of human life" describes a mental state that is more blameworthy than recklessness alone. Yet the court's instruction that extreme indifference "displays a lack of concern for social and legal responsibil-ity" and that the jury should "consider all the circumstances which reflect on her concern or lack of concern for her social and legal responsibilities" could reasonably have been

construed to mean that extreme indifference to the value of human life is *less* blameworthy than plain recklessness. Conduct is reckless when it is "a gross deviation from the standard of care that a reasonable person would observe in the situation," ORS 161.085(9), which may be worse than conduct that merely shows "a lack of concern for social and legal responsibility."[5] Thus, the instruction allowed the jury to conclude that recklessness alone was sufficient to prove "extreme indifference to the value of human life."

A finding that defendant acted recklessly is not the same as a finding that defendant acted recklessly *and* acted with extreme indifference to the value of human life. A person can commit a gross error in judgment without being indifferent to the consequences of that error. The instruction, as given, blurs that distinction.

The determination of whether defendant was extremely indifferent to the value of human life also required the jury to evaluate whether defendant's actions before, during, and after the crimes revealed a great lack of concern, not just for any social or legal responsibility, but for the specific responsibility to adjust one's actions to avoid the risk of death of another. The erroneous instruction allowed the jury to convict defendant based on her disregard of a different duty. Thus, the instruction gave the jury an inaccurate legal rule to apply to the facts of this case, and we conclude that the improper instruction probably affected the jury verdict on the manslaughter and assault charges. Accordingly, defendant's convictions on those charges must be reversed and remanded.

---

[5] The state appears to have taken the "lack of concern for social and legal responsibility" phrasing from a footnote in *Boone*, which states:

"Defendant in this case was also found guilty of driving while suspended. Were he driving with knowledge of suspension, that fact would be another indication of an indifferent state of mind, for it reflects a lack of concern for social and legal responsibility. However, after *State v. Buttrey*, 293 Or 575, 651 P2d 1075 (1982), knowledge of suspension is no longer required. The fact of suspension alone cannot therefore be used to infer a state of mind."

294 Or at 640 n 15. It appears that the purpose of that footnote, which is *dictum*, is to point out that, because driving while suspended is a strict liability crime, a conviction for that crime is not evidence of a person's state of mind. It does not establish the legal standard by which to determine whether a person has acted with extreme indifference to the value of human life.

Finally, we consider defendant's contention that the trial court improperly allowed the state's experts to testify, based on an incomplete DRE protocol, that she was impaired. Because scientific evidence has an "unusually high degree of persuasive power," a party who seeks to have scientific evidence admitted has the obligation, under OEC 401, OEC 702, and OEC 403, to show that the proffered evidence is based on scientifically valid principles. *State v. O'Key*, 321 Or 285, 291, 301, 899 P2d 663 (1995). Defendant argues that an incomplete DRE protocol is not a valid scientific test for impairment. Further, defendant argues, "[b]ecause the DRE protocol is not scientifically valid if incomplete and accordingly lacks a sufficient foundation establishing the reliability of any opinion based on the incomplete protocol, the admission of any portion of the protocol or any opinion based on the incomplete DRE [protocol] was error."

It is true that a properly conducted and completed 12-step DRE protocol is scientific evidence. *State v. Sampson*, 167 Or App 489, 496, 6 P3d 543, *rev den*, 331 Or 361 (2000). It is also true that "an incompletely administered DRE protocol is not, itself, admissible as scientific evidence." *State v. Aman*, 194 Or App 463, 473, 95 P3d 244 (2004), *rev dismissed*, 339 Or 281 (2005). In this case, however, the state did not argue that the entire DRE protocol, though uncompleted, was nevertheless admissible as valid scientific evidence. Rather, the state sought to introduce certain portions of the DRE protocol as evidence by independently laying a foundation for the admission of each facet of the DRE protocol that it wished to have admitted.[6] We have previously

---

[6] The state sought to introduce evidence about Clarke's preliminary observations of defendant, her answers to basic health questions, her vital signs, her answers to questions about her activities in the hours preceding the accident, and tests that Clarke conducted for signs of impairment, including three eye examinations—the horizontal gaze nystagmus test, the vertical gaze nystagmus test, and the lack of convergence test—and divided attention tests—the Romberg balance test, the walk and turn test, the one leg stand test, and the finger to nose test. The state also sought to introduce into evidence the results of the toxicological examination of defendant's blood and urine. Finally, the state wished to introduce testimony that, in Clarke's opinion, defendant was under the influence of a central nervous system depressant. Even though Clarke examined defendant's pupils, the state determined that it would not try to introduce that evidence because the hospital room in which defendant was tested "did not lend itself to administering the test in accordance with protocol." All of the above tests, interrogations, and observations are part of the standardized 12-step DRE protocol.

held that, if a proper foundation is laid for it, the results of an evidence-gathering technique that is a part of the 12-step DRE protocol is independently admissible. *State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013). For example, a horizontal gaze nystagmus (HGN) test, which is a part of that protocol, may be admissible if the party seeking its admission makes the "foundational showing that the officer who administered the test was properly qualified, that the test was administered properly, and that the test results were recorded accurately." *O'Key*, 321 Or at 289. Likewise, an officer's testimony that the officer observed signs of impairment in a defendant is admissible if the state establishes that the officer's training and experience makes the officer qualified to detect those signs of impairment. *State v. Wilson*, 266 Or App 286, 296, 337 P3d 948 (2014). Here, the trial court held a three-day hearing on the state's motion *in limine* and received testimony from several witnesses who discussed various aspects of the DRE protocol. Clarke testified about his training and experience, the tests he conducted, and his observations of defendant. Dr. Citek, a professor of optometry at Pacific University College of Optometry, testified about the scientific basis for the HGN and vertical gaze nystagmus tests for drug impairment. Dr. Nicholes, an emergency medicine physician, testified about how DRE protocols detect impairment by central nervous system depressants. Finally, Sergeant Iwai, the coordinator of the Oregon DRE program, testified about the development of the current DRE training program. On appeal, defendant does not argue that that testimony failed to lay a proper foundation for the admission of any component of the DRE protocol, either as scientific evidence or as ordinary expert testimony based on training and experience. Instead, the issue is whether the components of a DRE protocol are unconditionally inadmissible when the entire protocol was not completed. Under *Rambo* and *Wilson*, the answer is no. Consequently, the trial court was not required to exclude all evidence that resulted from the incomplete 12-step DRE protocol.

In summary, we conclude that the trial court properly denied defendant's motion to suppress and defendant's motion for judgment of acquittal on the two first-degree

manslaughter counts and the second-degree assault count. Likewise, the trial court did not err by failing to exclude the testimony of the state's expert witnesses. The trial court did, however, err when it instructed the jury that it could find that defendant acted with extreme indifference to value of human life based on a finding that defendant lacked "concern for social or legal responsibility." That erroneous instruction prejudiced defendant with respect to the two convictions for first-degree manslaughter and one conviction for second-degree assault. Consequently, we reverse and remand on those counts.

Convictions on Counts 1, 2, and 3 reversed and remanded; remanded for resentencing; otherwise affirmed.